**2025-1153**

# United States Court of Appeals for the Federal Circuit

In re: WSOU INVESTMENTS LLC,
dba Brazos Licensing and Development,

*Appellant.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Reexam No. 90/014,994*

## BRIEF FOR APPELLANT

SEAN D. BURDICK
BURDICK PATENTS
300 North Sixth Street, Suite 200
Boise, Idaho 83702
(208) 327-8900
sean@burdickpatents.com

– and –

RYAN S. LOVELESS
LOVELESS LAW GROUP
4760 Preston Road, No. 244-357
Frisco, Texas 75034
(972) 292-8303
ryan@lovelesslawgroup.com

*Counsel for Appellant*

JUNE 11, 2025

COUNSEL PRESS (800) 4-APPEAL • (380843)

**CLAIM LANGUAGE**

**U.S. Patent No. 9,357,014: Claim 1 (Appx47)**

1. An apparatus, comprising:

a processor and a memory communicatively connected to the processor, the processor configured to run a connected services stack, the connected services stack comprising a connected services layer configured to operate below an application layer and above a transport layer, wherein the connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, wherein the connected services layer is configured to support establishment of the service connection based on a service name of the connected services layer, a service name of the remote connected services layer, and a service connection identifier for the service connection, wherein the connected services layer is configured to:

send, toward a server, a service connection request message comprising the service name of the connected services layer and the service name of the remote connected services layer of the remote endpoint; and

receive, from the server, a service connection response message comprising the service name of the remote connected services layer of the remote endpoint, an Internet Protocol (IP) address of the remote endpoint, and the service connection identifier for the service connection.

**CLAIM LANGUAGE (continued)**

**U.S. Patent No. 9,357,014: Claim 18 (Appx48)**

18. A method, comprising:

running, by a processor, a connected services stack, the connected services stack comprising a connected services layer configured to operate below an application layer and above a transport layer, wherein the connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, wherein the connected services layer is configured to support establishment of the service connection based on a service name of the connected services layer, a service name of the remote connected services layer, and a service connection identifier for the service connection, wherein the connected services layer is configured to:

send, toward a server, a service connection request message comprising the service name of the connected services layer and the service name of the remote connected services layer of the remote endpoint; and

receive, from the server, a service connection response message comprising the service name of the remote connected services layer of the remote endpoint, an Internet Protocol (IP) address of the remote endpoint, and the service connection identifier for the service connection.

## CLAIM LANGUAGE (continued)

## U.S. Patent No. 9,357,014: Claim 19 (Appx48)

19. A non-transitory computer-readable storage medium storing instructions which, when executed by a computer, cause the computer to perform a method, the method comprising:

running a connected services stack, the connected services stack comprising a connected services layer configured to operate below an application layer and above a transport layer, wherein the connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, wherein the connected services layer is configured to support establishment of the service connection based on a service name of the connected services layer, a service name of the remote connected services layer, and a service connection identifier for the service connection, wherein the connected services layer is configured to:

send, toward a server, a service connection request message comprising the service name of the connected services layer and the service name of the remote connected services layer of the remote endpoint; and

receive, from the server, a service connection response message comprising the service name of the remote connected services layer of the remote endpoint, an Internet Protocol (IP) address of the remote endpoint, and the service connection identifier for the service connection.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1153

**Short Case Caption** In re: WSOU Investments LLC

**Filing Party/Entity** WSOU Investments LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/11/2024

Signature: /Ryan Loveless/

Name: Ryan Loveless

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
| --- | --- | --- |
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| WSOU Investments LLC | | OT WSOU Terrier Holdings II, LLC |
| | | OCO Opportunities Master Fund, L.P. |
| | | WSOU Holdings, LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ iv

TABLE OF AUTHORITIES ........ vii

GLOSSARY OF ABBREVIATIONS ........ ix

STATEMENT OF RELATED CASES ........ xi

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 7

STATEMENT OF THE ISSUES ........ 7

STATEMENT OF THE CASE ........ 9

I. The ‘014 Patent ........ 9

A. The Service Name Solution ........ 9

B. The ‘014 Patent Claims and the Remote Service Name ........ 11

II. The Traversat Reference ........ 15

A. Traversat’s Peer Discovery Protocol ........ 16

B. Traversat’s Connection Establishment Protocol ........ 17

III. PTAB Round 1 – Handling of the ‘014 Patent and Traversat Reference before the IPR Board ........ 19

A. The IPR Board Construed the Remote Service Name to Be One-and-the Same Throughout its Use in the Claims ........ 19

B. The IPR Board Concluded that Traversat Did not Render Obvious Claims of the ‘014 Patent ........ 20

IV. PTAB Round 2 – Handling of the ‘014 Patent and Traversat Reference in Reexamination ........ 21

A. The Examiner Disagreed with the IPR Board’s Construction and Rejected the Claims as Anticipated by Traversat ........ 22

B. The Reexamination Board Overturned the Anticipation Rejection and Inserted a New Ground of Rejection Asserting the Claims Were Obvious Over Traversat....................24

C. The USPTO Treated WSOU's BRP as a Request for Rehearing....................25

D. The USPTO Partially Addressed WSOU's Petition....................26

SUMMARY OF ARGUMENT....................27

STANDARD OF REVIEW....................29

ARGUMENTS....................30

I. The Reexamination Board's Decision is Not Supported by Substantial Evidence....................30

A. The Board's Obviousness Rejection Lacks the Required Articulated Reasoning and Evidentiary Support....................30

B. The Reexamination Board's Decision Misunderstood the Issues Presented in the Prior IPR Proceeding....................32

C. The Reexamination Board Impermissibly Shifted the Burden of Proof to WSOU....................34

II. THE REEXAMINATION BOARD'S CLAIM CONSTRUCTION IS ERRONEOUS....................35

A. The PTAB Departed from a Prior PTAB Claim Construction Without Reasoned Explanation....................35

B. The Reexamination Board's New Claim Construction Is Inconsistent with the Specification and Prosecution History....................37

C. The Board's Construction Improperly Conflates Distinct Claim Elements....................38

III. THE REEXAMINATION BOARD IMPROPERLY DISREGARDED TRAVERSAT'S TEACHINGS AWAY FROM THE CLAIMED INVENTION....................40

A. Traversat Teaches Away from Requiring a "Peer Name" for Discovery or Connection ....................................41

B. Traversat Teaches Away from a Centralized Server Architecture ....................................................................41

IV. The USPTO's Refusal to Reopen Prosecution and Enter Claim Amendments Following a New Ground of Rejection Was Improper ........................................................................................43

A. The USPTO Misapplied its Rules by Refusing to Recognize WSOU's "Appropriate Amendments" ...........................43

B. The USPTO Erroneously Characterized WSOU's Arguments as Lacking "New Evidence" .........................................46

C. The USPTO's Actions Denied WSOU Due Process and a Fair Opportunity to Respond .................................................47

D. The USPTO's Actions Improperly Attempt to Shift First Consideration of Substantive Issues to This Court .................48

CONCLUSION ..........................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Axonics, Inc. v. Medtronic, Inc.*,
75 F.4th 1374 (Fed. Cir. 2023) .......... 29

*BASF Corp. v. Enthone, Inc.*,
749 F. App'x 978 (Fed. Cir. 2018) .......... 35

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010) .......... 38, 39

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 29

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) .......... 40

*In re Baxter Int'l, Inc.*,
678 F.3d 1357 (Fed. Cir. 2012) .......... 35

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .......... 29

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) .......... 32

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) .......... 30

*In re Oetiker*,
977 F.2d 1443 (Fed. Cir. 1992) .......... 34

*In re Sullivan*,
498 F.3d 1345 (Fed. Cir. 2007) .......... 46

*In re Van Os*,
844 F.3d 1359 (Fed. Cir. 2017) .......... 31

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 37

*Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*,
130 F.4th 1372 (Fed. Cir. 2025) .......... 39

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019)........................................................ 29, 30

*Vicor Corp. v. SynQor, Inc.*,
869 F.3d 1309 (Fed. Cir. 2017)...............................................................35

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017)...............................................................30

**Statutes & Other Authorities:**

5 U.S.C. § 706.........................................................................................29

28 U.S.C. § 1295(a)(4)(A) ..............................................................................7

35 U.S.C. § 141 ..............................................................................................7

37 C.F.R. § 1.130 .........................................................................................46

37 C.F.R. § 1.131 .........................................................................................46

37 C.F.R. § 1.132 .........................................................................................46

37 C.F.R. § 1.181 ...........................................................................................7

37 C.F.R. § 1.530(d)(2) .................................................................................44

37 C.F.R. § 41.30(a) ......................................................................................46

37 C.F.R. § 41.50(b)(1) ............................................................................ *passim*

37 C.F.R. § 41.50(b)(2) .............................................................................7, 48

MPEP § 707.07(f) ..........................................................................................49

MPEP § 1214.01 ..................................................................................... 43, 44

MPEP § 2145 .................................................................................................49

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| '014 Patent | U.S. Patent No. 9,357,014 (Appx32–49) |
| USPTO | U.S. Patent and Trademark Office |
| WSOU | Appellant WSOU Investments LLC |
| Traversat | U.S. Patent No. 8,359,397 (Appx621-693) |
| WSOU | Appellant WSOU Investments LLC |
| Board | Patent Trial and Appeals Board |
| IP | Internet Protocol |
| IPR | *inter partes review* |
| Cisco | Cisco Systems, Inc., the petitioner in IPR2021-00961 and Requestor in 90/019,994 |
| IPR Board | The Board in IPR2021-00961 |
| PHOSITA | person having ordinary skill in the art |
| Remote Service Name | The claim term "service name of the remote connected services layer of the remote endpoint" in Independent Claims 1, 18, and 19 |
| CSL | Connected Services Layer |
| Reexamination Board | The Board in 90/019,994 |
| BRP | July 1, 2024 Brief Reopening Prosecution (Appx235-279) |

| | |
|---|---|
| RFR | Request for Rehearing |
| 1: Service Connection Request | First of three references to the use of a Remote Service Name in Independent Claims 1, 18, and 19 |
| 2: Service Connection Response | Second of three references to the use of a Remote Service Name in Independent Claims 1, 18, and 19 |
| 3: Service Connection Establishment | Third of three references to the use of a Remote Service Name in Independent Claims 1, 18, and 19 |
| Local Service Name | The claim term "service name of the connected services layer" in Independent Claims 1, 18, and 19 |
| Connection Identifier | The claim term "service connection identifier for the service connection" in Independent Claims 1, 18, and 19 |

## STATEMENT OF RELATED CASES

Under Circuit Rule 47.5, WSOU states as follows:

(a) No previous appeal has been taken in this action.

(b) There is no active parallel litigation involving the patent-at-issue.

## INTRODUCTION

This appeal confronts a cascade of errors by the U.S. Patent and Trademark Office (USPTO) concerning U.S. Patent No. 9,357,014 ("'014 Patent"), which is owned by WSOU Investments LLC ("WSOU").

The '014 Patent addresses a fundamental challenge in modern networking: the instability of connections in dynamic environments where Internet protocol ("IP") addresses frequently change. Traditional methods of maintaining connections using IP addresses are often suboptimal, leading to service disruptions. The '014 Patent introduces an innovative service-based networking capability, facilitated by a "Connected Services Layer" (CSL), which allows applications to establish and maintain connections primarily using a "service name," without direct reliance on the underlying, changing IP addresses.

The patentability of this inventive approach was previously scrutinized in an *inter partes review* (IPR), which involved the same reference at issue in this proceeding, U.S. Patent No. 8,359,397 ("Traversat"). In that proceeding (IPR2021-00961), the IPR Patent Trial and Appeals Board (the "IPR Board") construed the claim term "service name of the remote connected services layer of the remote endpoint" (referred to as the "Remote Service Name"). The IPR Board determined that the claims impose a "one-and-the-same" requirement: the Remote Service Name used in initiating a service connection request must be the same Remote Service

Name used later to establish that service connection. Applying this construction, the IPR Board concluded that the petitioner, Cisco, had failed to demonstrate that the Traversat prior art reference rendered the '014 Patent claims obvious, specifically because Traversat did not show this "one-and-the-same" use of any purported "Remote Service Name."

Despite this reasoned outcome, Cisco took a second bite at the apple and filed the underlying reexamination, citing the same Traversat reference. This time, however, the USPTO inexplicably reversed course. The Examiner disregarded the IPR Board's one-and-the-same construction and rejected the claims as anticipated by Traversat. Then, on appeal at the USPTO, the reexamination PTAB ("Reexamination Board") reversed the Examiner's anticipation rejection, but *sua sponte* issued a new ground that contended the independent claims were obvious over Traversat alone. In its decision, the Reexamination Board contended WSOU had not shown a lack of non-obviousness over Traversat alone (an issue not present in the reexamination) and agreed with the Examiner's construction – without any explanation as to why the IPR Board's "one-and-the-same" rejection was incorrect.

In its first opportunity to address the Reexamination Board's new ground, WSOU filed a brief reopening prosecution ("BRP") that presented claim amendments and evidence, specifically countering the new ground. The BRP also identified the conflicting claim construction. In response, the USPTO *sua sponte*

treated the BRP as a request for rehearing ("RFR"), incorrectly contending it lacked claim amendments and new evidence. In doing so, the USPTO did not enter the claim amendments, and the Reexamination Board used the RFR's misapprehension standard (as opposed to the BRP standard requiring the substance of the arguments to be addressed) and avoided addressing most of the issues presented in the BRP. And, for those that were addressed, the Reexamination Board summarily concluded that the WSOU Owner was wrong.

WSOU petitioned the USPTO for the BRP to be treated as filed and pointed to claim amendment and evidence submitted, the lack of due process, and the inconsistent claim construction needing to be addressed before appeal before the Federal Circuit. As the USPTO did not address this petition before the appeal, this Court allowed the USPTO to address post-appeal. However, the USPTO only partially addressed whether claim amendments and evidence were submitted and did not address the other items.

The USPTO's action should be reversed on four dispositive grounds.

First, the Reexamination Board's obviousness determination lacks the substantial evidence this Court requires. The Reexamination Board offered little more than a conclusory assertion that the claimed invention was an "obvious variation" of Traversat, failing to provide the "thorough and searching" factual inquiry and articulated reasoning mandated by law. It abdicated its responsibility to

explain how or why a person of ordinary skill would dismantle Traversat's distinct peer discovery and connection-establishment protocols, discard Traversat's own preferred identifiers, and instead forcibly integrate an optional "peer name" from discovery into Traversat's "pipe" (service connection) mechanism to purportedly arrive at the claim arrangement. This contradicts the prior IPR Board, which correctly identified the dispositive issue: not the mere existence of a "peer name" in Traversat, but its lack of use in establishing a connection as claimed. Compounding this error, the Reexamination Board improperly inverted the burden of proof, faulting WSOU for not rebutting a new obviousness theory that Reexamination Board had yet to articulate coherently.

Second, the Reexamination Board's reversal hinges on an erroneous and unexplained new claim construction of the critical Remote Service Name limitation. The Reexamination Board jettisoned the IPR Board's prior construction, which correctly recognized the "one-and-the-same" requirement: the same "Remote Service Name" must be utilized in the initial service connection request and subsequently as the basis for establishing the actual service connection. Without any analysis or justification, the Reexamination Board adopted a new, diluted interpretation where merely "finding" a peer name in Traversat satisfies the claim's subsequent establishment requirement. This construction not only contradicts the '014 Patent's specification, which consistently describes a sequential and integrated

use of the "Remote Service Name," but also improperly conflates and effectively reads out distinct claim elements requiring the "Remote Service Name" in three separate, sequential operations: the service connection request, the service connection response, and as a basis for service connection establishment.

Third, the Reexamination Board's obviousness rationale crumbles under the weight of Traversat's own explicit teachings away from the claimed invention—teachings the Reexamination Board inexplicably disregarded. Traversat unequivocally discourages the use of a "peer name" to uniquely identify a peer, directly undermining the Board's premise that a skilled artisan would invariably rely on and repurpose this optional "peer name." Even more strikingly, Traversat champions a decentralized architecture, warning against dependency on "any centralized services" and lauding its "100% decentralized" core services. These statements, which praise the avoidance of single points of failure inherent in centralized systems, directly teach against the Reexamination Board's forced reliance on Traversat to use a "server" as claimed. The Reexamination Board's conclusion requires a skilled artisan to ignore Traversat's core design philosophy and make a series of choices the reference itself actively discourages.

Fourth, and profoundly prejudicial, the USPTO's procedural machinations following the Reexamination Board's new ground of rejection systematically stripped WSOU of its fundamental due process rights. The USPTO erroneously

recharacterized WSOU's BRP—a submission WSOU was entitled to make to respond to the Board's new rejection—as a mere RFR. This misstep was not a harmless procedural shuffle; it was the linchpin for refusing entry of WSOU's "appropriate amendments," which were drafted to overcome the Reexamination Board's newly articulated obviousness rationale by, for example, incorporating limitations from an already-confirmed patentable dependent claim into new, narrower independent claims. The USPTO further compounded this unfairness by adopting an unjustifiably restrictive definition of "new evidence," summarily dismissing WSOU's evidence-based arguments detailing Traversat's teachings away as mere "attorney argument." These actions collectively denied WSOU its statutory right to reopen prosecution, to have its responsive amendments and evidence meaningfully considered by the Examiner in the first instance, and forced WSOU to appeal on a record it was improperly prevented from fully developing. Even a limited remand from this Court failed to rectify these injustices, as the USPTO sidestepped the substantive errors, perpetuating its attempt to improperly shift initial consideration of these critical, unaddressed issues to this Court.

For these independent reasons, WSOU requests that this Court reverse the Reexamination Board's decision of unpatentability and remand with instructions to the USPTO to treat WSOU's July 1, 2024, BRP as a proper request to reopen prosecution, enter the proposed amendments, and allow for full consideration.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.

The Reexamination Board issued a non-final decision on the reexamination of U.S. Patent No. 9,357,014 (Reexam No. 90/019,994) on April 30, 2024 ("Rex. Dec."), rejecting the challenged claims as obvious in a new ground. Appx1-21. WSOU timely filed a BRP on July 1, 2024 under 37 C.F.R § 41.50(b)(1). Appx235-279. The USPTO treated the BRP as a request for RFR under 37 C.F.R. § 41.50(b)(2), and the Reexamination Board denied rehearing on August 29, 2024. Appx21-30. WSOU subsequently filed a petition on October 4, 2024, to the USPTO Director under 37 C.F.R. § 1.181, requesting that the BRP be treated as a proper request to reopen prosecution under 37 C.F.R. § 41.50(b)(1). Appx284-291. WSOU also timely filed a notice of appeal to this Court on October 31. 2024, within the period prescribed by 35 U.S.C. § 141. Appx297-298.The USPTO partially addressed the petition on February 7, 2025, following a limited remand from this Court, but did fully resolve the issues raised. Appx299-306. This appeal is from a final decision of the USPTO, and no issues preclude this Court's jurisdiction.

## STATEMENT OF THE ISSUES

Whether the Reexamination Board's obviousness determination is unsupported by substantial evidence and based on legal error where the Board failed

to provide articulated reasoning for its conclusion and disregarded the contrary findings of the prior IPR.

Whether the Reexamination Board committed legal error by improperly shifting the burden of proof to WSOU to rebut a new ground of rejection that the Board raised for the first time on appeal.

Whether the Reexamination Board committed legal error by adopting a new claim construction of "Remote Service Name" that departs from a prior construction by the IPR Board, contradicts the patent's intrinsic record, and conflates distinct claim elements.

Whether the Reexamination Board erred as a matter of law by finding the claims obvious based on modifications that the Traversat reference explicitly teaches away from, including its discouragement of optional "peer names" and its core design philosophy favoring decentralized over centralized services.

Whether the USPTO violated WSOU's due process rights and abused its discretion by erroneously characterizing WSOU's Brief Reopening Prosecution (BRP) as a request for rehearing (RFR), refusing to enter appropriate claim amendments and consider new evidence, and failing to address substantive arguments, thereby improperly forcing WSOU to appeal on an undeveloped record.

## STATEMENT OF THE CASE

WSOU Appeals the Reexamination Board's decision (Appx1-21), the Reexamination Board's rehearing decision (Appx21-30), and the USPTO decision on WSOU's petition. (Appx299-306). Below is a summary of the '014 Patent and its independent claims, the Traversat reference, the prior IPR proceeding involving the '014 Patent and the Traversat reference, and the prior reexamination proceeding below.

### I. The '014 Patent

Traditional networking connections rely on IP addresses and port numbers for identification. Appx41 (1:11-12). However, a host's IP address frequently changes in dynamic environments such as mobile and cloud computing. Appx41 (1:13-15). The conventional methods for attempting to maintain connections amidst such changes are suboptimal. These methods involve either complex packet rerouting to maintain the original IP address or closing and re-establishing connections, which causes service disruption. Appx41 (1:13-24).

#### A. The Service Name Solution

To address these deficiencies, the '014 Patent discloses a service-based networking capability. Appx41 (2:24-26). This approach allows applications and services to establish and maintain connections using primarily a ***service name***, without requiring direct knowledge of the specific endpoint IP addresses or the

changing underlying communication network topology. Appx41 (2:39-42); Appx42 (4:14-18); Appx46 (12:5-8).

This capability is facilitated by a disclosed software layer called the "Connected Services Layer" (CSL). The CSL is positioned within the network stack below the application layer and above the transport layer. Appx41 (2:37-39); Appx42 (3:55-61); Appx34 (Fig. 2). In this position, the CSL serves to abstract network complexities from the application layer, acting as an interface for applications and services on endpoint devices. Appx42 (4:35-60).

Figure 3 of the '014 Patent illustrates an exemplary architecture incorporating the CSL. A first application (e.g., Application $112_A$ on Endpoint $110_A$) can initiate and connect with a second application (e.g., Application $112_Z$ on Endpoint $110_Z$) just by providing the ***service name*** to the connected services stack, which implements the CSL. Appx41 (2:39-42); Appx42 (4:14-18); Appx46 (12:5-8); Appx42 (3:33-44); Appx43 (7:53-64); Appx46 (12:5-8). From there, the CSL acts. For example, the first application may seek services from an energy meter monitoring application. Appx42 (4:33-34).




Appx35 (Fig. 3, shading added). In addition to simplifying connectivity, the CSL can be used to manage changes in endpoint IP addresses without disrupting the service connection and improve failover capabilities. Appx41 (2:45-48, 55-58); Appx42 (4:39-44); Appx45 (9:6-9); Appx46 (12:20-32, 58-61).

### B. The '014 Patent Claims and the Remote Service Name

Independent Claims 1, 18, and 19 of the '014 Patent are directed towards the operation of the CSL in using a service name to connect one application to another. The Remote Service Name (e.g., corresponding to the example energy meter monitoring application) is referenced in the claims as a "service name of the remote connected services layer of the remote endpoint."

In Independent Claims 1, 18, and 19, and its CSL operation, the Remote Service Name is recited three times: (1) in a service connection request message, (2) in a service connection response message, and (3) in the establishment of a service connection. Appx47-48.

#### 1. The Remote Service Name in a 1: Service Connection Request

The process begins with the first application providing the Remote Service Name to the CLS. Appx43 (5:65-6:3-8). Then, with reference to corresponding Figure 3 and the claims, the CSL sends towards a server (e.g., shown as Central Server 120), a "service connection request message" (hereinafter "1: Service Connection Request") that contains both the ***Remote Service Name*** and, also, the "service name of the connected services layer" (the "Local Service Name"). Appx43 (6:9-22); Appx35 (Service Lookup Request Message 310).




Appx35 (Fig. 3, shading and annotations added). Stated more concisely, this service request message contains both the Local Service Name and the Remote Service Name.

### 2. The Remote Service Name in 2: Service Connection Response

In response to this service request message, the server (e.g., Central Server 120) responds. With reference to the Independent Claims, the CSL receives from the server a "service connection response message" (hereinafter, "2: Service Connection Response") that contains the ***Remote Service Name***, an "Internet Protocol (IP) address of the remote endpoint," and "the service connection identifier for the

service connection" ("Connection Identifier"). Appx43 (6:27-50); Appx35 (Fig. 3, Service Lookup Response Message 320).




Appx35 (Fig. 3, shading and annotation added). The Connection Identifier provides a unique connection between applications to remain constant while the IP addresses can change. Appx46 (11:3-9).

### 3. The Remote Service Name in 3: Service Connection Establishment

Finally, with reference to the Independent Claims, the CLS supports the establishment of a service connection (hereinafter "3: Service Connection Establishment") based on the Remote Service Name, the Local Service Name, and the Connection Identifier. Appx43 (6:51-7:56); Appx35 (Fig. 3, Service Connection Establishment Interaction 330).




Appx35 (Fig. 3, shading and annotations added). The '014 Patent iterates that the service connection being established is between the CSLs of the endpoints rather than at the transport layers of the endpoints. Appx44 (7:42-45). The claims reflect the same – operation of the CSL below the application layer and above the transport layer. Appx47 (Independent Claim 1); Appx48 (Independent Claims 18 and 19).

## II. The Traversat Reference

Traversat discloses a peer-to-peer network. As Traversat explains, this "peer-to-peer platform preferably provides a decentralized environment that minimizes single points of failure and is not dependent on any centralized services." Appx658 (14:26-29). "The peer-to-peer platform core services are preferably 100% decentralized and thus may enable pure peer-to-peer network computing." Appx668

(34: 53-55). "Using the protocols, peers can cooperate to form self-organized and self-configured peer groups independently of their positions in the network (e.g. edges, firewalls), and without the need of a centralized management infrastructure." Appx672 (41:32-36).

In its multiple embodiments, Traversat discloses (1) a peer discovery protocol where peers can discover one another and (2) a connection-establishment protocol where peers can choose to connect and communicate. Appx673 (44:45-50); Appx61 (20:15-16).

### A. Traversat's Peer Discovery Protocol

The peer discovery protocol principally uses a Discovery Query Message and Discovery Response—seen in Figure 15 of Traversat.




*FIG. 15*

Appx633 (Fig. 15, highlighting added).

The Discovery Query Message (e.g. 230 or 232) is sent by a first-initiating peer (e.g., 200A) looking for certain types of information (called advertisements) from other peers. Appx677 (52:33-35, 45-55 (example message)). A peer (e.g., 200B) having responsive information can send the Discovery Response Message (e.g., 234) back to the initiating peer. Peers in Traversat's are uniquely identified by peer identifiers. Appx669 (35:6-36:15)(example peer advertisement), 36:26-27). Peers can also optionally have a peer name. Appx669 (36:19-21).

A special type of peer called a "rendezvous peer" can maintain information about other peers. For example, a "rendezvous peer" can cache advertisements and then later provide such advertisement information on behalf of other peers. Appx659-660 (16:59-17:4)

### B. Traversat's Connection Establishment Protocol

Traversat' s connection-establishment protocol uses what are called "pipes." A "pipe" is a virtual communication channel to enable message exchange between peers. With reference to Figure 30 of Traversat, pipes are managed by a pipe service that handles their creation, discovery, and binding. Pipes have their own advertisements. Appx670 (37:64-38:5, example pipe advertisement). Pipe identifiers uniquely identify pipes. Appx670 (38:14-16).




*FIG. 30*

Appx645 (Fig. 30, highlighting added).

Traversat describes the following process to allow peers to communicate over a pipe with reference to Figure 31.

1. A first peer creates a pipe using the pipe service.
2. The pipe service creates an advertisement for the pipe.
3. A second peer queries the network for the pipe advertisement.
4. When the second peer receives the necessary information, it binds to the pipe and links and output of the second peer with an input of the first peer (or vice versa – depending on the direction of travel of the pipe).

Appx663 (23:52-24:11, Figure 31)

## III. PTAB Round 1 – Handling of the '014 Patent and Traversat Reference before the IPR Board

Before the reexamination resulting in this appeal, the petitioner (Cisco) asserted that Traversat rendered obvious the independent claims of the '014 Patent in IPR2021-00961. Appx987 (Grounds for Challenges). In denying institution, the IPR Board construed the claims and concluded based on such a construction there was a lack of evidence that Traversat rendered the claims obvious. Appx970 (construction); Appx973-975 (conclusion).

### A. The IPR Board Construed the Remote Service Name to Be One-and-the Same Throughout its Use in the Claims

In IPR2021-00961, the IPR Board determined that the claims impose a "one-and-the-same" requirement for the Remote Service Name used in initiating and establishing a service connection. Specifically, the IPR Board explained:

> Because the former limitation refers to "*a* service name" and the latter limitation refers to "*the* service name," those limitations together require a service connection request message that includes the *same* "service name of the remote connected services layer" that is used to establish the service connection.

Appx970 (emphasis by IPR Board). Stated differently, the Remote Services Name in the 1: Service Connection Request must be the ***same*** as the Remote Service Name in the 3: Service Connection Establishment.

This one-and-the-same requirement of the Remote Service Name being used in the 1: Service Connection Request and in the 3: Service Connection

Establishment, again, can be seen labeled items 1 and 3 in Figure 3 with reference to the "service lookup request message 310" and "service connection establishment 330."




Appx35 (Fig. 3, shading added).

### B. The IPR Board Concluded that Traversat Did not Render Obvious Claims of the '014 Patent

In IPR2021-00961, the petitioner (Cisco) contended that the independent claims of the '014 Patent were rendered obvious over Traversat. Appx987 (Grounds for Challenges). However, of its own accord,[1] the IPR Board concluded that there

[1] WSOU argued that the Petitioner did not show sufficiently that Traversat teaches a service connection request message comprising the service name of the remote

was a lack of evidence that Traversat rendered obvious the one-and-the-same requirement of the Remote Service Name in the claims. Appx973-975. In particular, the IPR Board noted that Cisco contended that Traversat's "peer name" corresponded to the claimed Remote Service Name in the 1: Service Connection Request ("Petitioner argues that Traversat teaches a discovery query message that includes the peer name of the endpoint peer.") while contending a separate feature, Traversat's "peer identifier" corresponded to the Remote Service Name used in the 3: Service Connection Establishment ("On the other hand, Petitioner argues that Traversat teaches establishing a service connection based on the peer identifier of the endpoint peer."). Appx973.

In concluding that Cisco did not provide sufficient evidence of the one-and-the-same requirement for the Remote Service Name's use in the claims, the IPR Board identified passages from Traversat citing differences between the "peer name" and "peer identifier." Appx973-974.

## IV. PTAB Round 2 – Handling of the '014 Patent and Traversat Reference in Reexamination

After the IPR Board concluded on December 6, 2021 that Traversat did not render obvious the claims of the '014 Patent, Cisco filed the underlying request for

---

connected services layer. Appx972-973. While agreeing with WSOU's conclusion, the IPR Board cited a different reason – the lack of evidence of the one-and-the-same feature. Appx973-974

reexamination on April 5, 2022. Appx53-70. Cisco contended that, despite relying on Traversat again, it was introducing a different argument with respect to Traversat. Appx64.

### A. The Examiner Disagreed with the IPR Board's Construction and Rejected the Claims as Anticipated by Traversat

The Examiner adopted Cisco's assertion that a different argument concerning Traversat was being presented. Appx88 (Decision granting reexamination); however, the Examiner pointed to the same features from Traversat that were previously considered in IPR2021-00961[2]—with one exception. While pointing ***again*** to the "peer name" previously cited in the IPR proceeding (as allegedly corresponding to the claimed Remote Service Name in the 1: Service Connection Request), the Examiner concluded that the claims do not require one-and-the-same requirement cited by the IPR Board. Appx132 (February 20, 2023 Final Office Action ("FOA")). In particular, the Examiner cited ***nothing*** in Traversat as corresponding to the claimed features surrounding the claimed 3: Service Connection Establishment – noting instead that the discovery of a peer name was enough. Appx132. Whereas Cisco had previously cited Traversat's "peer identifier" as allegedly corresponding to such a feature (Appx973), the Examiner remained silent. More precisely, the Examiner presented ***less*** evidence than the Cisco cited

[2] *See* Appx187-188 (Reexam Appeal Opening Brief, demonstrating identical Traversat features identified in the Reexamination FOA and IPR Proceeding).

when the IPR was rejected for lack of evidence. The Examiner also alleged Traversat anticipated the independent claims rather than rendering such claims obvious. Appx133.

Below is a side-by-side showing of the IPR's Board's Construction and the FOA's rejection of it.

| **IPR Board Construction** | **FOA** |
|---|---|
| Because the former limitation refers to "*a* service name" and the latter limitation refers to "*the* service name," those limitations together require a service connection request message that includes the *same* "service name of the remote connected services layer" that is used to establish the service connection. *Id.* at 14:37–47, 16:38–48, 16:65–17:8<br><br>Appx970 (Italic emphasis by IPR Board) | [T]he claim does not require "the same service name of the remote services layer that is used to establish the service connection" as Patent Owner argues.<br><br>. . .<br><br>Patent Owner offers no basis to reinterpret the claim limitations narrowly to require the actual use of the service names to establish a service connection.<br><br>Appx132. |

(Highlighting added). Ultimately, the Examiner provided no evidence of the one-and-the-same feature for the Remote Service Name claim in Traversat. Also, the Examiner cited nothing from the intrinsic record of the '014 Patent supporting a reason for deviating from the IPR's Board construction.

### B. The Reexamination Board Overturned the Anticipation Rejection and Inserted a New Ground of Rejection Asserting the Claims Were Obvious Over Traversat

On appeal, the Reexamination Board overturned the Examiner's Traversat anticipation rejection. It concluded that Traversat does ***not*** disclose "peer names" in the "discovery query messages" – what the Examiner contended disclosed the claimed Remote Service Name in the "service connection request message." Appx12. However, the Reexamination Board stated that "Traversat at least suggests as much" – citing the following from Traversat:

1. Figure 15's discovery query message 232—directed to rendezvous peers.
2. Col. 52, ll. 16–17: "Named peers may also be located using the peer discovery protocol."
3. Col. 45, ll. 20–27: "In one embodiment, peer discovery may be done with, or alternatively without, specifying a name for the peer to be located."

Appx13. Ultimately, the Board concluded:

> Considered collectively, the import of these teachings is that specifying a name of the peer to be located in discovery query message 232 would have been at least an obvious variation to discover that particular peer by name to establish a connection to that peer ultimately.

Appx13. The Reexamination Board also incorporated by reference the Examiner's original mappings in the FOA at 5-7 and treated those findings as its own "articulated findings" in support of the obviousness rejection. Appx12.

Regarding the one-and-same claim construction from the IPR Board, the Reexamination Board agreed with the Examiner. Appx14-15 – reaching a different interpretation of the claims than the IPR Board. In particular, according to the

Reexamination Board, the “finding of the name” satisfied the latter half of the one-and-same requirement for the Remote Service Name. Below is a side-by-side comparison of the two Board’s constructions.

| IPR Board Construction | Reexamination Board Construction |
|---|---|
| Because the former limitation refers to “*a* service name” and the latter limitation refers to “*the* service name,” those limitations together require a service connection request message that includes the *same* “service name of the remote connected services layer” that is used to establish the service connection. *Id*. at 14:37–47, 16:38–48, 16:65–17:8<br><br>Appx970 (Italic emphasis by IPR Board) | [U]sing this service name as a basis to support a service connection's establishment does not necessarily use that name to actually establish that connection: it is merely used as a basis to support that establishment. And as the Examiner indicates, the remote peer's name does just that, for it is used to find the peer - a key initial step in establishing a connection to that peer.<br><br>Appx14-15 |

(Highlighting added).

### C. The USPTO Treated WSOU’s BRP as a Request for Rehearing

When the Reexamination Board issued a new ground of rejection, overturning the Examiner’s anticipation rejection and instead inserting a new obviousness rejection, in its first opportunity to address this new ground, WSOU timely sought to reopen prosecution via a July 1, 2024, “Brief Reopening Prosecution” (BRP). Appx235-279. This BRP included both claim amendments designed to address the Reexamination Board’s new obviousness rationale and new evidence and analysis concerning the prior art. Appx238-258; Appx269-276. The BRP also challenged the

lack of an articulated reasoning, inconsistent claim constructions between the IPR Board and Reexamination Board, and improper conflation of elements. Appx269-276.

The USPTO treated the BRP as an RFR and refused entry of the claim amendments. Appx21-30. In its rehearing denial, the Reexamination Board did not answer the substance presented in the BRP – treating the BRP under the higher misapprehension standard for an RFR. Appx21-30.

### D. The USPTO Partially Addressed WSOU's Petition

On October 4, 2024, WSOU petitioned (including a co-filed emergency petition to consider the petition) the USPTO seeking its BRP be treated as filed – yielding entry of the claim amendments and consideration of the evidence and arguments presented therein. Appx284-291 (petition); Appx292-293 (emergency petition). The petition argued (1) issues in the reexamination being premature for appeal due to the USPTO's lack of reconciliation between the IPR Board and Reexamination Board's construction, (2) a violation of due process rights (for failure to engage or respond to the substance of the BRP), and (3) the USPTO failure to recognize the BRP as containing both amended claims and new evidence. Appx284-291.

On October 31, 2024, WSOU filed its notice of appeal to this Court. Appx297. As the petition was undecided, this Court granted the USPTO a limited remand to

address the petition. However, in its February 7, 2025, Decision on the Petition, the USPTO only partially addressed one of the three issues presented – the USPTO's failure to recognize the BRP as containing both amended claims claim and new evidence. Appx299-306.

## SUMMARY OF ARGUMENT

The USPTO's decisions rejecting the '014 Patents as obvious over Traversat and also refusing entry of WSOU's BRP must be reversed due to legal, factual, and procedural errors.

First, the Reexamination Board's *sua sponte* obviousness determination lacks substantial evidence. The Reexamination Board provided no articulated reasoning explaining why a skilled artisan would modify Traversat's distinct peer discovery and connection protocols to repurpose an optional "peer name" as the claimed "Remote Service Name" in the precise manner required. It misinterpreted the prior IPR Board's findings, which rejected a similar challenge for lack of evidence, and improperly shifted the burden to WSOU to rebut an unarticulated obviousness theory, violating established law.

Second, the Reexamination Board's new construction of Remote Service Name is erroneous. It inexplicably abandoned the IPR Board's one-and-the-same" construction—requiring the same service name in the connection request and establishment—without reason. This new construction contradicts the '014 Patent's

specification, ignores prosecution history, and impermissibly conflates distinct claim elements, undermining the claims' sequential requirements.

Third, the Reexamination Board disregarded evidence of Traversat's explicit teachings away from the claimed invention. Traversat discourages reliance on optional "peer names," favoring unique identifiers, and champions a decentralized architecture, warning against centralized servers. The Reexamination Board's rationale, which hinges on using a "peer name" and a "rendezvous peer" as a server, contravenes Traversat's core teachings, rendering its obviousness conclusion untenable.

Fourth, the USPTO's procedural errors denied WSOU due process. By mischaracterizing WSOU's BRP as an RFR, the USPTO refused to enter appropriate claim amendments and consider new evidence, violating 37 C.F.R. § 41.50(b)(1). This forced WSOU to appeal on an undeveloped record, thwarting its statutory right to respond to the new rejection. The USPTO's limited remand response failed to rectify these errors, improperly shifting substantive issues to this Court.

WSOU respectfully requests a reversal of the Board's decisions and remand with instructions to treat the July 1, 2024, BRP as a proper request to reopen prosecution, enter the proposed amendments, and fully consider WSOU's arguments and evidence.

## STANDARD OF REVIEW

This Court "review[s] the Board's compliance with the procedural requirements of the Administrative Procedure Act ('APA') de novo." *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1380 (Fed. Cir. 2023). This Court "shall … set aside agency action, finding, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706.

This Court "review[s] the Board's obviousness determination de novo and its underlying factual determinations for substantial evidence." *TQ Delta, LLC v. Cisco Sys., Inc.,* 942 F.3d 1352, 1357 (Fed. Cir. 2019). "[T]he 'substantial evidence' standard asks whether a reasonable fact finder could have arrived at the agency's decision, and is considered to be a less deferential review standard than 'arbitrary, capricious.'" *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)(citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," which "is more than a mere scintilla." *Id*. (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)(citations omitted). This Court's "'substantial evidence' review involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id*. "If the intrinsic record fully governs the proper construction of a term,

[the Court] review[s] the Board's claim construction de novo." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.,* 853 F.3d 1272, 1278 (Fed. Cir. 2017).

## ARGUMENTS

### I. The Reexamination Board's Decision is Not Supported by Substantial Evidence

The Reexamination Board's *sua sponte* obviousness decision fails the substantial evidence standard because it lacks the articulated reasoning required to justify its new ground of rejection, is premised on a misapprehension of the dispositive issue from the prior IPR proceeding, and impermissibly shifted the burden of proof to WSOU to prove non-obviousness. Each of these failures provides an independent basis for reversal.

#### A. The Board's Obviousness Rejection Lacks the Required Articulated Reasoning and Evidentiary Support

This Court has repeatedly held that an obviousness conclusion "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *TQ Delta, LLC v. Cisco Sys*., 942 F.3d 1352, 1359 (Fed. Cir. 2019)(internal citations omitted). A "thorough and searching" factual inquiry is mandated, demanding specificity in the USPTO's reasoning. *In re Lee*, 277 F.3d 1338, 1343 (Fed. Cir. 2002). When an obviousness case requires modifying a prior art reference, the Board must make specific factual findings as to ***why*** a person of

ordinary skill in the art ("PHOSITA") would have been motivated to make that modification. *In re Van Os*, 844 F.3d 1359, 1361 (Fed. Cir. 2017).

The Reexamination Board's failure to meet these fundamental requirements is stark. Its analysis rests entirely on the unsupported assertion that, based on Traversat's teachings, it would be "an obvious variation to discover [a] particular peer by name to establish a connection to that peer ultimately." Appx13. This conclusion ignores what Traversat teaches and fails to explain why a PHOSITA would discard parts of the reference to reconstruct it into the claimed invention.

Traversat discloses two separate and distinct protocols: (1) a discovery protocol that can optionally return a "peer name" in an advertisement (Appx673 (44:45-50); Appx669 (36:19-21); Appx633 (Fig. 15)) and (2) a connection-establishment protocol that uses a "pipe identifier" to create a data "pipe." Appx61 (20:15-16); Appx670 (38:14-16). The "peer name" is an optional discovery attribute; the "pipe identifier" is the key to a pipe's connection. The Reexamination Board's decision provides no reasoning or evidence to bridge the critical gap between the separate embodiments referencing a "peer name" and a "pipe," which use "pipe identifiers." Specifically, the Board failed to make any finding explaining:

1. Why a PHOSITA would discard Traversat's explicit teaching of using a "pipe identifier" for connection to instead substitute an optional "peer name" from a separate protocol;

2. How a PHOSITA would technically integrate this “peer name” into Traversat’s fundamentally different “pipe” establishment mechanism; or
3. That this substitution would even result in a functional protocol, let alone one that preserves Traversat's functionality.

Simply put, the Reexamination Board failed to explain why a PHOSITA would be interested in using a “peer name” to support establishing a “pipe.” It is enough to allege features could be modified; rather, there must be articulated reasoning for the modification. The Reexamination Board provided no such articulated reasoning. In failing to answer these questions, the Reexamination Board’s analysis is a textbook case of impermissible hindsight. *See In re Kahn*, 441 F.3d 977, 986 (Fed. Cir. 2006) (“[W]e infer that the Board used hindsight” when it “does not ex[]plain the motivation, or the suggestion or teaching” for the claimed combination).

### B. The Reexamination Board’s Decision Misunderstood the Issues Presented in the Prior IPR Proceeding

The Reexamination Board’s decision is also undermined by its fundamental misunderstanding of the issues previously addressed in IPR2021-00961. The Reexamination Board framed the issue as whether Traversat’s “discovery request message” could include a “peer name.” Appx13. Indeed, the concurring opinion in its decision exemplifies this misapprehension: “the majority determines that it would have been obvious to a person of ordinary skill in the art to include a peer name in

Traversat's discovery query message. I agree. Accordingly, join the majority's new grounds of rejection." Appx19. This, however, was not the core issue.

The core issue, as correctly considered by the IPR Board, was whether Traversat discloses that such a "peer name"—even if present in a discovery message—is ***used*** in the manner required by the claims to establish a service connection (which the Reexamination Board itself equated with Traversat's "pipes"). In IPR2021-00961, the petitioner (Cisco) argued that Traversat's discovery message included a peer name and that its pipes corresponded to the claimed service connection. Appx972-975. The IPR Board, after considering Cisco's arguments, focused its analysis on Traversat's teachings regarding what is used for pipe establishment. Finding no evidence that a "peer name" was used to establish these "pipes," the IPR Board concluded that the claims were not unpatentable over Traversat. Appx972-975.

In contrast, the Reexamination Board truncated its analysis. It accepted the premise that a "peer name" could be "found," but failed to undertake the critical next step: determining whether Traversat teaches using that specific peer name in the manner claimed for establishing service connection. This is the very analysis the IPR Board correctly performed. By failing to address ***how*** or ***why*** Traversat's actual pipe establishment protocol relates to any discovered "peer name" and the claim limitations, and by characterizing arguments grounded in Traversat's express

teachings as mere "attorney argument," the Reexamination Board based its decision on a misapprehension of the relevant technical and legal questions, further demonstrating the lack of substantial evidence supporting its conclusion.

### C. The Reexamination Board Impermissibly Shifted the Burden of Proof to WSOU

The Reexamination Board also committed a procedural error by inverting the steadfast rule that the USPTO bears the initial burden of establishing a prima facie case of unpatentability. *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992).

The Reexamination Board inverted this burden when it *sua sponte* raised a new obviousness rejection on an appeal from an anticipation rejection, and in the same decision, faulted WSOU for not rebutting a theory that had not previously existed. Appx13-14 (contending there is no evidence of non-obviousness). The Reexamination Board compounded this error on rehearing. Instead of providing the required articulated reasoning for its new rejection when challenged, it again faulted WSOU. It dismissed the substantive challenge to its deficient prima facie case as mere attorney argument. Appx24 (citing its decision "noting a lack of evidence" of non-obviousness in the underlying record concerning alleged anticipation). The Reexamination Board cannot sidestep its foundational burden and then fault the patentee for its failure.

## II. THE REEXAMINATION BOARD'S CLAIM CONSTRUCTION IS ERRONEOUS

The Reexamination Board's decision rested on a new and erroneous construction of the term "Remote Service Name." This new construction departs from the prior IPR Board construction, is inconsistent with the patent's specification, and improperly conflates distinct claim elements. Each of these errors independently warrants reversal.

### A. The PTAB Departed from a Prior PTAB Claim Construction Without Reasoned Explanation

This Court has cautioned that "[w]hen a party who has lost in a court proceeding challenging a patent, from which no additional appeal is possible, provokes a reexamination in the PTO, using the same presentations and arguments, even with a more lenient standard of proof, the PTO ideally should not arrive at a different conclusion." *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1365 (Fed. Cir. 2012). Where "a panel simultaneously issues opinions on the same technical issue between the same parties on the same record, and reaches opposite results without explanation, we think the best course is to vacate and remand these findings for further consideration." *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1322 (Fed. Cir. 2017)(concerning inconsistent reexamination decisions); *see, also, BASF Corp. v. Enthone, Inc.*, 749 F. App'x 978, 986 (Fed. Cir. 2018)(concerning inconsistent IPR decisions).

Here, the IPR Board in reviewing the same ’014 Patent and the same Traversat reference, expressly construed the claimed “Remote Service Name.” Citing its antecedent basis use, the IPR Board determined that the “Remote Service Name” recited in the claims must be the ***same*** name used in the “1: Service Connection Request” and subsequently as the basis for the “3: Service Connection Establishment.” Appx970. This construction was central to the IPR Board’s decision not to institute trial, finding a lack of evidence that Traversat disclosed this requirement. Appx973-974.

Despite this construction, the Reexamination Board used a different construction to reach the opposite conclusion. In particular, the Reexamination Board concluded that: (1) merely finding or discovering a “peer name” in Traversat’s discovery phase is sufficient to disclose the “Remote Service Name” in the claimed “1: Service Connection Request”), and (2) the critical second part of the IPR Board’s construction—that this ***same*** name must also be used as the basis for the “3: Service Connection Establishment”—is effectively ***not*** required. Appx14.

While initially “noting” the IPR Board’s construction (Appx6), the Reexamination Board ultimately ***agreed*** with the Examiner’s construction, concluding that finding a “peer name” yields ***using*** such a name as a “basis to support” a connection with that peer in the manner claimed. Appx14.

In this conclusion, the Reexamination Board did not explain why the IPR Board's construction was erroneous or why changed circumstances might warrant a different interpretation. The Reexamination Board also provided no discussion of the intrinsic evidence—the '014 Patent's specification or claims—that would compel such a reinterpretation. This unexplained departure from a prior Board construction on the same patent term and the same prior art, violates the principles of consistency and reasoned decision-making articulated by this Court.

### B. The Reexamination Boards New Claim Construction Is Inconsistent with the Specification and Prosecution History

A fundamental tenet of claim construction is that claim terms are interpreted consistently with the intrinsic record, primarily the patent's specification and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-17 (Fed. Cir. 2005) (en banc). The IPR Board's construction, requiring the ***same*** "Remote Service Name" to be used in the initial connection request and later for connection establishment, aligns with the '014 Patent's disclosure. Both the specification and the claims of the '014 Patent describe a sequence where "Remote Service Name" is used in the initial connection request (Appx43 (6:9-22); Appx35 (Service Lookup Request Message 310), and then ***also*** used as a basis for establishing the actual service connection. Appx43 (6:51-7:56, referencing use of the Remote Service Name for establishing connection); Appx35 (Fig. 3, Service Connection Establishment Interaction 330). One example described "use" as a basis for

establishing the service connection is a message called the "service connection request message" that includes the Remote Service Name. Appx43 (6:56-57).

In contrast, the Reexamination Board's construction treats the claims as if "finding" a name satisfies the claim elements of the '014 Patent. In concluding as much, the Reexamination Board's decision does not explain how such an understanding can be reconciled with the '014 Patent's teachings.

### C. The Board's Construction Improperly Conflates Distinct Claim Elements

"Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010)(internal citations omitted). The independent claims at issue distinctly recite the use of the "Remote Service Name" in (1) a "1: Service Connection Request," (2) a related "2: Service Connection Response," and (3) as a basis for the "3: Service Connection Establishment."




Appx35 (Fig. 3, shading and annotations added).

The Reexamination Board, however, adopted the FOA's reasoning that a ***single event*** in Traversat—the discovery or finding of a "peer name"—somehow satisfies the use of the "Remote Service Name" across all three of these distinct claimed elements. Appx14-15. This amounts to an impermissible conflation of separate limitations.

While the presumption of distinctness established in *Becton, Dickinson* can be rebutted, doing so requires "evidence that shows that the impliedly distinct components, instead, can be satisfied by a single component." *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, 130 F.4th 1372, 1380 (Fed. Cir. 2025). The Reexamination Board made no such showing, nor could it. To the contrary, the IPR

Board's earlier decision was predicated on the understanding that Traversat lacked evidence of the "Remote Service Name" being used in the distinct manners required for both the "1: Service Connection Request" and the "3: Service Connection Establishment." The Reexamination Board's current construction, which finds all these limitations met by a single, generalized disclosure in Traversat, contravenes established claim construction principles and lacks basis in the intrinsic record.

## III. THE REEXAMINATION BOARD IMPROPERLY DISREGARDED TRAVERSAT'S TEACHINGS AWAY FROM THE CLAIMED INVENTION

"A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009)(internal citation omitted). "A reference does not teach away, however, if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." *Id.* (internal citations omitted). The Reexamination Board's obviousness determination fails to account for and runs contrary to Traversat's explicit teachings that discourage the modification the Reexamination Board proposes.

### A. Traversat Teaches Away from Requiring a "Peer Name" for Discovery or Connection

The Reexamination Boards's finding that it would have been obvious to use Traversat's "peer name" to establish a service connection disregards Traversat explicit teachings concerning why "names" are preferably ***not used*** and described as "optional." Due to its peer-to-peer nature, Traversat's peers need unique identifiers, for example, to allow relocation. Appx658 (13:66-14:8). Traversat explains that a "peer identifier" is required because it provides such a unique identifier. Appx656 (9:18-34); Appx660 (17:16-18); Appx669 (36:26-27). However, a "peer name" does not provide uniqueness; it is "an optional string that can be associated with a peer." Appx660 (17:21-27, emphasis added); Appx669(36:19-21). To guarantee a "name" is unique, Traversat explains that additional complexity is required, namely the use of a centralized naming service. Appx660 (17:21-27).

### B. Traversat Teaches Away from a Centralized Server Architecture

The Reexamination Board's contention that a PHOSITA would use a server is similarly irreconcilable with Traversat's repeated and emphatic preference for a ***decentralized*** architecture, actively discouraging dependence on central servers. Traversat extols the virtues of decentralization:

1. "The peer-to-peer platform preferably provides a ***decentralized*** environment that minimizes single points of failure and is ***not*** dependent on any centralized services." Appx658 (14:26–29, emphasis added).

2. “The peer-to-peer platform core services are preferably 100% ***decentralized*** and thus may enable pure peer-to-peer network computing.” Appx668 (33:53–57, emphasis added).
3. "Using the protocols, peers can cooperate to form self-organized and self-configured peer groups independently of their positions in the network (e.g. edges, firewalls), and ***without*** the need of a ***centralized*** management infrastructure." Appx672 (41:32–36, emphasis added).
4. “Embodiments of a discovery method in the peer-to-peer platform preferably ***do not require*** centralized naming (e.g. no DNS).” Appx674 (46:19–21, emphasis added).

The Reexamination Board contended that embodiments in Traversat ***could*** involve use of a central server and cites Traversat’s need for unique identifiers for peers and how a central naming service would be used in such scenarios. Appx26-27. However, such a need for uniqueness is ***why*** Traversat ***discourages naming*** in the first place—instead, preferring unique identifiers with no need for the additional complexity of central servers. While contending the use of the discouraged and more complex arrangement in using names is an “engineering tradeoff” (Appx6), the Reexamination Board cites no benefit yielded from disregarding Traversal’s teachings about avoiding such servers. The mere recitation of a discouraged configuration does not negate the reference’s predominant teaching away from reliance on such centralized structures. Traversat’s consistent emphasis on the benefits of decentralization—such as avoiding single points of failure and dependency on centralized services—would discourage a PHOSITA from selecting

a centralized model as the basis for a new design, particularly one that requires such a server as a core component like the claimed invention.

The Reexamination Board's obviousness conclusion requires a PHOSITA to make a series of choices that Traversat itself discourages to not only take an optional "peer name" and repurpose it in a manner Traversat does not disclose (i.e., for establishing "pipes" or service connections), but also to do so within a centralized server framework that Traversat actively teaches against.

## IV. The USPTO's Refusal to Reopen Prosecution and Enter Claim Amendments Following a New Ground of Rejection Was Improper

When the Reexamination Board issued a new ground of rejection, overturning the Examiner's anticipation rejection and instead inserting a new obviousness rejection, WSOU, as a matter of right, was entitled to seek a reopening of prosecution via its BRP. The USPTO's *sua sponte* treatment of the WSOU's BRP as an RFR and subsequent denial of a petition to correct this error constitute a misapplication of the USPTO's own rules, an abuse of discretion, and a denial of WSOU's due process rights.

### A. The USPTO Misapplied its Rules by Refusing to Recognize WSOU's "Appropriate Amendments"

The USPTO's conclusion (Appx305) that WSOU's claim amendments in its BRP were not "appropriate" under 37 C.F.R. § 41.50(b)(1) and MPEP § 1214.01 is incorrect.

***First***, WSOU's new claims are unequivocally an "amendment of the claims" as contemplated by 37 C.F.R. § 41.50(b)(1). As the regulations explain, a "new claim being proposed" or a "proposed added claim" is an amendment of the claims. 37 CFR 1.530(d)(2).[3]

***Second***, these "amendments" to the claims are "appropriate." The USPTO-cited MPEP § 1214.01 states an amendment is "appropriate" if it "amends one or more of the claims rejected, or substitutes new claims ***to avoid the art or reasons adduced by the Board***." (Emphasis added). WSOU's BRP did precisely this.

In amending the claims, WSOU presented new independent claims 34 and 50, which incorporated the limitations of dependent claim 16—a claim the Examiner had already confirmed as patentable—into the framework of the Board-rejected independent claims 18 and 19, respectively. Appx238 (explaining amendment). This is a quintessential, and indeed recommended, method of narrowing claims to avoid prior art or an adjudicator's adverse reasoning, directly aligning with the express purpose of an "appropriate amendment." The USPTO's insistence that original

[3] 37 CFR 1.530(d)(2) "Claims. An amendment paper must include the entire text of each patent claim which is being proposed to be changed by such amendment paper and of each ***new claim being proposed*** to be added by such amendment paper. For any claim changed by the amendment paper, a parenthetical expression "amended," "twice amended," etc., should follow the claim number. Each patent claim proposed to be changed and each ***proposed added claim*** must include markings pursuant to paragraph (f) of this section, except that a patent claim or proposed added claim should be canceled by a statement canceling the claim, without presentation of the text of the claim."(emphasis add).

claims 18 and 19 must also be "canceled" for the amendment to be "appropriate" is unsupported.

Additionally, WSOU introduced new dependent claims 52-60, which were specifically drafted to further distinguish the claims from the prior art in light of the Board's new obviousness reasoning and to definitively resolve claim construction disputes that the Board's new rejection had surfaced. Appx256-258. For example, reacting directly to the Board's new claim construction posture—which implied that the "Remote Service Name" need not be used in the claimed "3: Service Connection Establishment"—dependent Claim 52 unambiguously required such use, thereby narrowing the claim scope to address the Reexamination Board's concern. Such narrowing, responsive amendments are indisputably "appropriate" under any reasonable interpretation of § 41.50(b)(1).

WSOU did not merely add new, unrelated claims. It strategically presented narrower versions of the independent claims (by incorporating confirmed, allowable limitations) and added new dependent claims that further refined the scope of the rejected independent claims. This indisputably was done "to avoid the art or reasons adduced by the Board." The USPTO's steadfast refusal to recognize these as "appropriate amendments" under § 41.50(b)(1) was a clear misapplication of its guidelines and an abuse of discretion.

### B. The USPTO Erroneously Characterized WSOU's Arguments as Lacking "New Evidence"

The USPTO also erroneously concluded that WSOU's BRP lacked "new evidence," suggesting this term encompasses only formal declarations under 37 C.F.R. §§ 1.130, 1.131, or 1.132. Appx3041. This restrictive interpretation is not only inconsistent with the broader definition of "Evidence,"[4] but also directly contravenes this Court's precedent. This Court has clarified that, in the context of countering an obviousness allegation, "[r]ebuttal evidence is merely a showing of facts supporting the opposite conclusion.'" *In re Sullivan*, 498 F.3d 1345, 1351 (Fed. Cir. 2007) (internal citation omitted). Critically, "Evidence rebutting a prima facie case of obviousness can include . . . evidence that the prior art teaches away from the claimed invention in any material respect." *Id*. (internal citations omitted).

When the Reexamination Board overturned the Examiner's ***anticipation*** rejection and, for the first time, advanced its new ***obviousness*** theory, asserting that Traversat "suggests" the claimed features, it introduced new factual premises regarding the teachings of Traversat. WSOU's detailed technical rebuttal, which analyzed the explicit teachings of that reference to demonstrate, for instance, teaching away and the conspicuous absence of any articulated reasoning, inherently

[4] *See* 37 C.F.R. § 41.30(a)("Evidence means something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact . . ."),

involved presenting an evidentiary counter-narrative about the factual content of that prior art.

These arguments, anchored in the specific, verifiable disclosures of Traversat, directly counter the factual underpinnings of the Reexamination Board's new obviousness rationale. To dismiss them as mere "arguments concerning the Board's rejection, not new evidence that relates to the claims that are rejected" (Appx305) is to ignore that the Reexamination Board's assertion about what Traversat allegedly "suggests" is itself a new factual contention. A rebuttal grounded in the actual teachings of Traversat is precisely the type of submission "relating to the claims so rejected" that § 41.50(b)(1) contemplates when allowing for "new Evidence." The USPTO's artificially narrow reading deprived WSOU of its sole meaningful opportunity to counter the Board's new factual assertions about the prior art with its own equally factual analysis.

### C. The USPTO's Actions Denied WSOU Due Process and a Fair Opportunity to Respond

The cumulative effect of the USPTO's erroneous characterization of WSOU's BRP was a denial of fundamental due process. The right to amend claims to meet a rejection is a bedrock principle of patent prosecution. When the Board issues a new ground of rejection, an appellant is statutorily entitled to an opportunity to return to the Examiner to address that new rejection, including by making "appropriate amendments" and submitting "new evidence." 37 C.F.R. § 41.50(b)(1).

By summarily shunting WSOU's BRP into the § 41.50(b)(2) rehearing track—a track reserved for situations where prosecution is ***not*** reopened—the USPTO ensured that the proposed amendments would not be entered and that the substantive arguments and evidence would be viewed only through the exceedingly narrow lens of whether the Board "misapprehended or overlooked" something in its new rejection based on the then-existing record. This maneuver effectively denied WSOU its first and most appropriate opportunity to respond to the new obviousness theory with narrowed claims and focused evidence for consideration by the Examiner, who is best positioned to evaluate such responses in the first instance. This procedural shortcut, forcing an appeal on a record that WSOU was improperly prevented from developing, is antithetical to principles of fairness and administrative regularity.

The very purpose of § 41.50(b)(1) is to prevent precisely this situation: an appeal decided on a ground the applicant never had a fair chance to address with amendments and new evidence before the Examiner. The USPTO's approach thwarts this statutory and regulatory intent and constitutes an abuse of discretion that warrants correction by this Court.

### D. The USPTO's Actions Improperly Attempt to Shift First Consideration of Substantive Issues to This Court

WSOU's BRP and its subsequent Petition did not merely seek entry of claim amendments; they also requested that the USPTO address the inconsistencies in

claim construction, the lack of articulated reasoning, and other evidentiary errors embedded in the Reexamination Board's *sua sponte* new rejection. Had the BRP been treated appropriately under § 41.50(b)(1), the USPTO (through the Examiner) would have been ***required*** to provide a reasoned response to the substance of WSOU's arguments and evidence. *See, e.g.,* MPEP § 707.07(f) (Examiner must "answer the substance" of an argument); MPEP § 2145 ("Office personnel should consider all rebuttal arguments and evidence presented by applicants.").

However, by improperly treating WSOU's BRP as a request for rehearing, the Board could selectively address—or, more accurately, ignore—WSOU's arguments. This effectively nullified WSOU's first opportunity to have its response to the Board's new ground of rejection meaningfully considered. The Reexamination Board disregarded specific arguments, dismissed others as mere attorney arguments despite their factual basis, and claimed its decision had addressed others when, in fact, it had not. Even when the USPTO was granted a limited remand by this Court to address these issues, the USPTO sidestepped these substantive arguments, focusing solely on its flawed procedural justification.

By systematically failing to address the merits of WSOU's BRP, any answer the USPTO provides in this appeal would be an improper attempt to obtain this Court's initial consideration of these unaddressed issues.

## CONCLUSION

For these independent reasons, WSOU requests that this Court reverse or vacate the Reexamination Board's decision of unpatentability and remand with instructions to the USPTO to treat WSOU's July 1, 2024, BRP as a proper request to reopen prosecution, enter the proposed amendments, and allow for full consideration.


/s/Ryan Loveless

Ryan Loveless
Loveless Law Group PLLC
4760 Preston Road
No. 244-357
Frisco, TX 75034
(972) 292-8303
ryan@lovelesslawgroup.com

Sean D. Burdick
Burdick Patents, P.A.
300 N. 6th Street
Suite 200
Boise, ID 83702
(208) 327-8900
sean@burdickpatents.com

*Counsel for WSOU Investments LLC*


June 11, 2025

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,994 | 04/05/2022 | 9357014 | 43614.403 | 5194 |

131515 7590 04/30/2024
Burdick Patents
2537 State Street, Suite 220
Boise, ID 83701

| EXAMINER | |
|---|---|
| CHOI, WOO H | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/30/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* WSOU INVESTMENTS LLC
Patent Owner and Appellant

---

Appeal 2024-001882
Reexamination Control 90/014,994
United States Patent 9,357,014 B2
Technology Center 3900

---

Before JOHN A. JEFFERY, ROBERT J. WEINSCHENK, and MICHAEL J. ENGLE, *Administrative Patent Judges*.

Opinion for the Board filed by JEFFERY, *Administrative Patent Judge*.

Opinion concurring filed by WEINSCHENK, *Administrative Patent Judge*.

DECISION ON APPEAL

Appellant[1] appeals under 35 U.S.C. §§ 134 and 306 the Examiner's decision to reject claims 1–15, 18, and 19. Claims 16 and 17 are indicated as containing patentable subject matter. *See* Final Act. 13. We have jurisdiction under 35 U.S.C. §§ 134 and 306.

We REVERSE and enter new grounds of rejection.

---

[1] Appellant identifies the real party in interest as "WSOU Investments, LLC d/b/a Brazos Licensing and Development." Appeal Br. 2 (listing "Brazos"), 1 (defining "Brazos").

STATEMENT OF THE CASE

This proceeding arose from a request for *ex parte* reexamination filed on April 5, 2022, of United States Patent 9,357,014 B2 ("the '014 patent"), issued to Shamilian et al. on May 31, 2016.

The '014 patent describes service-based networking. To this end, the invention uses a connected services stack with a connected services layer to establish service connections between endpoints, where the service connections are below an application layer and above a transport layer. *See* '014 patent Abstract. Claim 1 illustrates the invention and is reproduced below:

> 1. An apparatus, comprising:
>
> a processor and a memory communicatively connected to the processor, the processor configured to run a connected services stack, the connected services stack comprising a connected services layer configured to operate below an application layer and above a transport layer, wherein the connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, wherein the connected services layer is configured to support establishment of the service connection based on a service name of the connected services layer, a service name of the remote connected services layer, and a service connection identifier for the service connection, wherein the connected services layer is configured to:
>
> send, toward a server, a service connection request message comprising the service name of the connected services layer and the service name of the remote connected services layer of the remote endpoint; and

> receive, from the server, a service connection response message comprising the service name of the remote connected services layer of the remote endpoint, an Internet Protocol (IP) address of the remote endpoint, and the service connection identifier for the service connection.

## RELATED PROCEEDINGS

Appellant states that this appeal is related to (1) a district court proceeding, namely *WSOU Investments LLC v. Cisco Systems, Inc.*, 6-21-cv-00128 (W.D. Tex.); and (2) an *inter partes* review (IPR) proceeding at this Board, namely *Cisco Systems, Inc. v. WSOU Investments, LLC*, IPR2021-00961, Paper 10 (PTAB Dec. 6, 2021) (denying institution) ("IPR '961 Dec'n"). *See* Appeal Br. 3.

In the earlier IPR proceeding, another panel of this Board held that the petitioner did not demonstrate a reasonable likelihood of prevailing in showing that claim 1 of the '014 patent would have been obvious over the same claim and prior art reference that are also at issue here in connection with the Examiner's anticipation rejection. *See* IPR '961 Dec'n at 11.

## THE REJECTIONS

The Examiner rejected claims 1–11, 18, and 19 under 35 U.S.C. § 102(a)(2) as anticipated by Traversat (US 8,359,397 B2; issued Jan. 22, 2013). Final Act. 5–7.[2]

[2] Throughout this opinion, we refer to (1) the Final Office Action mailed February 10, 2023 ("Final Act."); (2) the Appeal Brief filed August 11, 2023 ("Appeal Br."); (3) the Examiner's Answer mailed September 28, 2023 ("Ans."); and (4) the Reply Brief filed November 28, 2023 ("Reply Br.").

The Examiner rejected claims 12–15 under 35 U.S.C. § 103 as unpatentable over Traversat and Guo (US 2005/0015427 A1; published Jan. 20, 2005). Final Act. 11–13.

THE ANTICIPATION REJECTION

The Examiner finds that Traversat discloses every recited element of independent claim 1 including a "connected services layer," namely peer-to-peer (P2P) platform core 120 and services 140, that supports establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, namely a remote peer. *See* Final Act. 5–7; Ans. 16. According to the Examiner, Traversat's connected services layer supports establishment of the service connection based on (1) a service name of the connected services layer, namely a peer's name in an advertisement; (2) a service name of the remote connected services layer, namely the name of a peer to be located via discovery query message 232; and (3) a service connection identifier, namely a pipe identifier. *See* Final Act. 5–6; Ans. 16.

The Examiner also finds that Traversat sends, towards a server, namely a rendezvous peer, a "service connection request message," namely the discovery query message, comprising (1) the service name of the connected services layer; and (2) the service name of the remote connected services layer of the remote endpoint. *See* Final Act. 6–7; Ans. 15–17.

Appellant argues that the Examiner not only disregards the Board's prior claim construction, but also fails to show that Traversat discloses a service connection request message that includes the same service name of

the remote connected services layer that is also used to establish the service connection. *See* Appeal Br. 17–22; Reply Br. 1–10. Appellant adds that the Examiner's relied-upon messages in Traversat pertain to the sender or requester and, therefore, do not include a service name of the remote connected services layer of the remote endpoint as claimed. Appeal Br. 22–27; Reply Br. 10–13.

## ISSUE

Under § 102, has the Examiner erred in rejecting claim 1 by finding that Traversat discloses a connected services layer configured to (1) support establishment of a service connection based on a service name of a remote connected services layer; and (2) send, toward a server, a service connection request message comprising that service name?

## ANALYSIS

We begin by noting, as did another panel of this Board in the earlier related IPR proceeding, that claim 1 recites, in pertinent part, "*a* service name of the remote connected services layer" and later "*the* service name of the remote connected services layer." *See* IPR '961 Dec'n at 6. Given this antecedent basis, claim 1 requires that the remote connected services layer's service name that is used as a basis to support establishment of the service connection is the *same* as the service name in the service connection request message that is sent toward a server. *See id.*; *accord* Ans. 12 (acknowledging this antecedent basis); Reply Br. 6 (same).

In rejecting claim 1, the Examiner maps the recited service connection request message to Traversat's discovery query message 232 in Figure 15 (*see* Final Act. 6)—a mapping that was reiterated repeatedly in the Answer. *See* Ans. 15–17. That is, the Examiner relies solely on Traversat's discovery query message 232 in Figure 15—and no other message—for anticipating the recited service connection request message.

The Examiner also maps the recited "service name of the remote connected services layer" *solely* to a peer name, specifically the name of a remote peer to be located. *See* Final Act. 6–7; Ans. 12, 14. We emphasize this point because, unlike the petitioner in the earlier IPR proceeding, the Examiner here maps *all* recited instances—not just one instance—of the recited "service name of the remote connected services layer" to a peer name. *See* Final Act. 6–7; Ans. 12, 14.

That is, the Examiner's mapping differs from that proposed by the petitioner in the earlier IPR proceeding. In that proceeding, the petitioner equated the first recited instance of the remote connected services layer's service name to a *peer identifier* in Traversat, but equated a later recited instance of that service name to a *peer name* in Traversat. *See* IPR '961 Dec'n at 8 (noting that the petitioner relied on the endpoint peer's *peer identifier* as the service name of the remote connected services layer used to establish the service connection, but relied on endpoint peer's *peer name* as the service name of the remote connected services layer that is included in the service connection request message). This reliance on both the peer identifier and peer name in Traversat was a key factor in the Board's denying institution in that proceeding, for the petitioner failed to show that

the peer identifier and peer name were the same and, therefore, failed to show that Traversat teaches the same service name of the remote connected services layer as claim 1 requires. *See* IPR '961 Dec'n at 9–11.

That is not the case here, however. Nor does the Examiner ignore the Board's construction of claim 1 in this respect as Appellant contends (*see* Appeal Br. 17–19; Reply Br. 5–7); indeed, the Examiner acknowledges it. *See* Ans. 12 (acknowledging the Board's construing "*a* service name of the remote connected services layer" as the same name as "*the* service name of the remote connected services layer" appearing later in the claim given its antecedent basis) (emphasis added).

Here, despite (1) the same claim; (2) the same claim construction; and (3) the same prior art reference at issue, the dispositive issues in this appeal and the earlier IPR proceeding differ materially. First, as noted previously, the Examiner's mapping all instances of the recited service name of the remote connected services layer to the same element—specifically a peer name in Traversat—differs from the petitioner's reliance on different elements in Traversat in this regard.

Second, unlike the IPR proceeding, the dispositive issue here turns on whether Traversat *anticipates* claim 1's disputed limitations—not whether they would have been obvious over Traversat which, notably, the Requester proposed at the outset of this proceeding. *Compare* Request for Ex Parte Reexamination Under 35 U.S.C. §§ 302–306 filed Apr. 5, 2022 ("Request") at 14 (proposing to reject claim 1 as *obvious* over Traversat), *with* Final Act. 5 (rejecting claim 1 as *anticipated* by Traversat).

This distinction is significant, for anticipation requires every recited element be *necessarily* present—not merely probably or possibly present—in the prior art. *See Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1363–64 (Fed. Cir. 2019). So here, to anticipate, Traversat must *disclose* a connected services layer configured to (1) support establishment of a service connection based on a service name of a remote connected services layer; and (2) send, toward a server, a service connection request message that comprises *that* service name. In other words, Traversat's service connection request message, namely discovery query message 232 in Figure 15 under the Examiner's mapping, must comprise the *same* service name—or peer name under the Examiner's mapping—as that is used as a basis for supporting establishment of the service connection as the claim requires.

On this record, the Examiner fails to satisfy this requirement for anticipation. Traversat's Figure 15 shows "using messages to discover advertisements[3] according to one embodiment." Traversat col. 52, ll. 12–13. As shown by the second arrow in Traversat's Figure 15, discovery query message 232 is directed from requesting peer 200A to peer 200B, where the text within the arrow indicates that the discovery query message is unicast to rendezvous peers.[4]

[3] In Traversat's parlance, an "advertisement" is a structured, language-neutral metadata structure that names, describes, and publishes the existence of a P2P platform resource, such as a peer, peer group, pipe, or service. *See* Traversat col. 34, ll. 59–62.
[4] "Rendezvous peers" are peers that offer to cache advertisements to help other peers discover resources and propagate requests they cannot answer to other known rendezvous peers. *See* Traversat col. 45, ll. 6–9.

In one embodiment, a discovery query message may be used to send a discovery request to find advertisements (e.g., for peers or peer groups). *Id.* col. 52, ll. 33–35. In column 52, lines 44 to 64, Traversat shows an exemplary discovery query message in XML and associated field descriptions reproduced below.

```
<?xml version="1.0" encoding="UTF-8"?>
<DiscoveryQuery>
      <Credential> Credential </Credential>
      <QueryID> query id</QueryID>
      <Type> request type (e.g. PEER, GROUP, PIPE, SERVICE,
      CONTENT)
      </Type>
      <Threshold> requested number of responses </Threshold>
      <PeerAdv> peer advertisement of requestor </PeerAdv>
      <Attr> attribute </Attr>
      <Value> value </Value>
</DiscoveryQuery>
```

Embodiments of a discovery query message may include, but are not limited to, the following fields:
Credential: The credential of the sender
QueryID: Query identifier
Type: specifies which advertisements are returned
Threshold: requested number of responses
PeerAdv: peer advertisement of requester
Attr: specifies the query attribute
Value: specifies the query value

**Traversat's exemplary discovery query message and field descriptions**

As shown above, Traversat's exemplary discovery query message includes fields and associated values specifying, among other things, the *sender's* credential in the "Credential" field, the *requester's* peer advertisement in the "PeerAdv" field, etc. *See id.* col. 52, ll. 44–64. Our emphasis underscores that, at least in this example, the name of a peer to be

located via this request is not included in the discovery query message, but rather information pertaining to the sender or requester. *Accord* Reply Br. 11 (noting this fact).

Nor does the information associated with the other fields in Traversat's exemplary discovery query message specify a peer name, much less the name of a peer to be located via this message. Although the *type* of request specified in Traversat's exemplary discovery query message can be, for example, "PEER," in column 52, line 47, this request type is not disclosed as being a peer's *name*, much less that of a remote peer.

To be sure, Traversat notes in connection with Figure 15 that "*[n]amed* peers may also be located using the peer discovery protocol." Traversat col. 52, ll. 16–17. We also acknowledge that Traversat elsewhere discloses, "[i]n one embodiment, peer discovery may be done with, or alternatively without, specifying a *name* for the peer to be located." *Id.* col. 45, ll. 20–27 (emphasis added). But Traversat does not *disclose* that the discovery query message 232 (i.e., what the Examiner equates to the recited service connection request message) includes these named peers. That Traversat's discovery query message *could* include—or even *probably would* include—the named peers to be located via this message is insufficient to anticipate. "[D]ifferences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Therefore, we are constrained by this record to conclude that the Examiner erred in rejecting as anticipated (1) independent claim 1;

(2) independent claims 18 and 19 that recite commensurate limitations; and (3) dependent claims 2–11 for similar reasons.

Nevertheless, as explained in our new ground of rejection below, we conclude that these claims would have been obvious to ordinarily skilled artisans based largely on the Examiner's findings in the anticipation rejection.

## THE OBVIOUSNESS REJECTION

Because the Examiner has not shown that Guo cures the foregoing deficiencies regarding the rejection of independent claim 1, we do not sustain the Examiner's obviousness rejection of dependent claims 12–15 (Final Act. 11–13) for similar reasons.

## NEW GROUNDS OF REJECTION

### *Claims 1–11, 18, and 19*

Under 37 C.F.R. § 41.50(b), we newly reject claims 1–11, 18, and 19 under 35 U.S.C. § 103 as obvious over Traversat.

Regarding independent claim 1, we adopt the Examiner's articulated findings from Traversat because these findings, while not anticipating the claim, nonetheless at least suggest every recited limitation. *See* Final Act. 5–7. These findings are, therefore, applicable here and incorporated by reference.

As noted previously, a key aspect of our adopted findings is mapping all recited instances of a "service name of the remote connected services

layer" to a peer name, specifically the name of a remote peer to be located. *Accord* Final Act. 6–7; Ans. 12, 14.

Although Traversat does not state *explicitly* that the discovery query message 232, i.e., the claimed "service connection request message," includes the same peer name, or "service name," of the remote connected services layer that is also used as basis to support establishment of the service connection as claim 1 requires, Traversat at least suggests as much.

As explained previously, Traversat's Figure 15 shows using messages to discover "advertisements" according to one embodiment. Traversat col. 52, ll. 12–13. As shown by the second arrow in Traversat's Figure 15, discovery query message 232 is directed from requesting peer 200A to peer 200B, where the text within the arrow indicates that the discovery query message is unicast to rendezvous peers.

Traversat also teaches that, in connection with Figure 15, "*[n]amed* peers may also be located using the peer discovery protocol." Traversat col. 52, ll. 16–17. Moreover, "[i]n one embodiment, peer discovery may be done with, or alternatively without, specifying a *name* for the peer to be located," as Traversat indicates in column 45, lines 20–27 (emphasis added).

Considered collectively, the import of these teachings is that specifying a name of the peer to be located in the discovery query message 232 would have been at least an obvious variation to discover that particular peer by name to ultimately establish a connection to that peer. To the extent Appellant contends that ordinarily skilled artisans would be incapable of including the name of the peer to be located in Traversat's discovery query message or that doing so would somehow be beyond the skill level of

ordinarily skilled artisans, there is no persuasive evidence on this record to substantiate such a contention.

And even assuming, without deciding, that Traversat's respective teachings on which we rely pertain to different embodiments, there is no dispute that these teachings cannot be combined or otherwise considered collectively. Nor is there persuasive evidence on this record proving otherwise. In short, nothing on this record precludes considering Traversat's respective teachings collectively even if they pertain to different embodiments. In fact, the very nature of Traversat's flexible platform implementation at least suggests as much. *Accord* Request 14 (noting that ordinarily skilled artisans can select and combine various features from Traversat's different embodiments).

In short, when considering Traversat's teachings collectively, ordinarily skilled artisans would have understood that specifying the name of the peer to be located in the discovery query message would have been at least an obvious variation, where this "service name" is also used at least as a basis to support establishment of connection to that peer.

We reach this conclusion noting, as does the Examiner, that claim 1 does not recite that the connected services layer is configured to *establish* a service connection. Rather, the claim recites that this layer uses the remote connected services layer's service name merely as a *basis* to *support establishment* of the service connection. *Accord* Ans. 14 (noting this distinction). In other words, using this service name as a basis to support a service connection's establishment does not necessarily use that name to actually establish that connection: it is merely used as a *basis* to *support* that

establishment.[5] And as the Examiner indicates, the remote peer's name does just that, for it is used to *find* the peer—a key initial step in establishing a connection to that peer. *See* Ans. 14.

On this record, then, Traversat at least suggests including a "service name," specifically a remote peer's name, of a remote connected services layer in a "service connection request message," such as discovery query message 232. Traversat also at least suggests that this remote peer's name or "service name" is used at least as a basis to support establishment of a service connection between the connected services layer and remote connected services layer as claimed. Therefore, the recited usage and inclusion of the service name of the remote connected services layer in the service connection request message would have been obvious to ordinarily skilled artisans.

We reach this conclusion noting the level of skill in this art that was not disputed in the '961 IPR, namely a person with (1) a bachelor's degree in electrical engineering, computer engineering, or equivalent training; (2) approximately two years of professional experience in the field of communication networks; and (3) a working knowledge of the communication network art that is pertinent to the '014 patent. *Accord* IPR '961 Dec'n at 5 (adopting this proposed skill level).

[5] In the '961 IPR, the panel addressed whether the petitioner had shown sufficiently that Traversat's peer name and peer identifier are the same. *See* IPR '961 Dec'n at 9–11. The panel did not need to specifically address what the phrase "configured to support establishment of the service connection based on . . . a service name of the remote connected services layer" in claim 1 requires. *See id.*

Therefore, for the foregoing reasons, claim 1 would have been obvious over Traversat. We reach a similar conclusion regarding claims 2–11, 18, and 19 for the reasons noted above and in light of the Examiner's undisputed findings in connection with these claims that are incorporated here by reference. *See* Final Act. 7–11.

*Claims 12–15*

We newly reject claims 12–15 under 35 U.S.C. § 103 as obvious over Traversat and Guo for the reasons noted above and in light of the Examiner's undisputed findings in connection with these claims that are incorporated here by reference. *See* Final Act. 11–13.

CONCLUSION

In summary:

| Claims Rejected | 35 U.S.C. § | References/Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 1–11, 18, 19 | 102(a)(2) | Traversat | | 1–11, 18, 19 | |
| 1–11, 18, 19 | 103 | Traversat | | | 1–11, 18, 19 |
| 12–15 | 103 | Traversat, Guo | | 12–15 | 12–15 |

TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv). *See* 37 C.F.R. § 41.50(f).

NEW GROUND OF REJECTION

This decision contains a new ground of rejection pursuant to 37 C.F.R. § 41.50(b). Section 41.50(b) provides "[a] new ground of rejection pursuant to this paragraph shall not be considered final for judicial review." Section 41.50(b) also provides:

> When the Board enters such a non-final decision, the appellant, within two months from the date of the decision, must exercise one of the following two options with respect to the new ground of rejection to avoid termination of the appeal as to the rejected claims:
>
> (1) *Reopen prosecution.* Submit an appropriate amendment of the claims so rejected or new Evidence relating to the claims so rejected, or both, and have the matter reconsidered by the examiner, in which event the prosecution will be remanded to the examiner. The new ground of rejection is binding upon the examiner unless an amendment or new Evidence not previously of Record is made which, in the opinion of the examiner, overcomes the new ground of rejection designated in the decision. Should the examiner reject the claims, appellant may again appeal to the Board pursuant to this subpart.
>
> (2) *Request rehearing.* Request that the proceeding be reheard under § 41.52 by the Board upon the same Record. The request for rehearing must address any new ground of rejection and state with particularity the points believed to have been misapprehended or overlooked in entering the new ground of rejection and also state all other grounds upon which rehearing is sought.

Further guidance on responding to a new ground of rejection can be found in the Manual of Patent Examining Procedure § 1214.01.

REVERSED; 37 C.F.R. § 41.50(b)

PATENT OWNER/APPELLANT:

BURDICK PATENTS
2537 STATE STREET, STE 220
BOISE, ID 83701

THIRD PARTY REQUESTER:

HAYNES AND BOONE, LLP
IP SECTION
2323 VICTORY AVENUE, STE 700
DALLAS, TX 75219

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* WSOU INVESTMENTS LLC
Patent Owner and Appellant

---

Appeal 2024-001882
Reexamination Control 90/014,994
United States Patent 9,357,014 B2
Technology Center 3900

---

Before JOHN A. JEFFERY, ROBERT J. WEINSCHENK, and MICHAEL J. ENGLE, *Administrative Patent Judges*.

WEINSCHENK, *Administrative Patent Judge*, concurring.

I respectfully concur with the majority's decision, but I do not join the majority's entire analysis. According to the majority, the Examiner did not show sufficiently that Traversat discloses a discovery query message that includes a peer name. I disagree. Traversat discloses that "peer discovery may be done with . . . specifying a name for the peer to be located and/or the group to which peers belong." Traversat, col. 45, ll. 21–27. And Traversat discloses that a discovery query message may specify a "PEER" or "GROUP." *Id.* at col. 52, ll. 39–60. Thus, in my view, Traversat discloses a discovery query message that includes a peer name. As a result, I do not join the majority's reversal of the Examiner's rejections.

Nonetheless, the majority determines that it would have been obvious to a person of ordinary skill in the art to include a peer name in Traversat's discovery query message. I agree. Accordingly, I join the majority's new grounds of rejection.

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,994 | 04/05/2022 | 9357014 | 43614.403 | 5194 |

131515 7590 08/29/2024

Burdick Patents
2537 State Street, Suite 220
Boise, ID 83701

| EXAMINER | |
|---|---|
| CHOI, WOO H | |
| **ART UNIT** | **PAPER NUMBER** |
| 3992 | |
| **MAIL DATE** | **DELIVERY MODE** |
| 08/29/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

WSOU INVESTMENTS, LLC
Patent Owner and Appellant

Appeal 2024-001882
Reexamination Control No. 90/014,994
Patent 9,357,014 B2
Technology Center 3900

Before JOHN A. JEFFERY, ROBERT J. WEINSCHENK, and MICHAEL J. ENGLE, *Administrative Patent Judges*.

JEFFERY, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

On July 1, 2024, Appellant[1] filed a response to our decision mailed April 30, 2024 ("Dec.") where we reversed the Examiner's decision to reject (1) claims 1–11, 18, and 19 under 35 U.S.C. § 102(a)(2) as anticipated by Traversat[2]; and (2) claims 12–15 as obvious under 35 U.S.C. § 103 over Traversat and Guo. Dec. 15. We also newly rejected (1) claims 1–11, 18,

[1] Appellant identifies "WSOU Investments, LLC d/b/a Brazos Licensing and Development" as the real party in interest. Appeal Br. 2 (listing "Brazos"), 1 (defining "Brazos").

[2] For brevity, we omit Traversat's and Guo's full citations here that were provided on page 3 of our earlier decision.

and 19 as obvious under 35 U.S.C. § 103 over Traversat; and (2) claims 12–15 as obvious over Traversat and Guo. *See id.*

On page 1 of Appellant's response, Appellant states that the response was filed for the "reopening of prosecution" under 37 C.F.R. § 41.50(b)(1). But because Appellant's response includes an amendment that fails to comply with that rule, the Central Reexamination Unit did not enter that amendment. *See* Notice Regarding Patent Owner's Response filed July 1, 2024 mailed July 23, 2024, at 2.

The Central Reexamination Unit then returned Appellant's response to the Board to consider the arguments as a request for rehearing under 37 C.F.R. § 41.50(b)(2). *Id.* Accordingly, we treat Appellant's response filed July 1, 2024 as a request for rehearing,[3] but do not consider the accompanying amendment, for it was not entered.

Turning to the Request, Appellant contends that our new ground of rejection is erroneous because it (1) lacks the requisite articulated reasoning for an obviousness rejection; (2) disregards the Board's prior reasoning without any explanation; (3) ignores evidence that Traversat teaches away from the claimed features; and (4) contradicts Federal Circuit precedent. *See* Req. Reh'g 4, 33–43.

Regarding argument (1), Appellant contends that not only does Traversat not use peer names in (a) service connection request messages or (b) establishing the service connection, but also extending the absence of a

---

[3] Throughout this decision, we refer to Appellant's response filed July 1, 2024 as a rehearing request ("Request"), and abbreviate it as "Req. Reh'g."

peer name in Traversat's discovery request message to using such a name to establish a "pipe" is erroneous. *See* Req. Reh'g 33–36.

But as we indicated on pages 11 to 13 of our earlier decision that is incorporated by reference here under 37 C.F.R. § 41.52(a)(1), we determined that Traversat's collective teachings at least *suggest* that specifying a name of the peer to be located in discovery query message 232 would have been an obvious variation to discover that particular peer by name to ultimately establish a connection to that peer. Our emphasis on the word "suggest" underscores that while Traversat may not state this particular message-based peer name location explicitly, Traversat nonetheless suggests as much. *See Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) ("[T]he question under 35 [U.S.C.] § 103 is not merely what the references *expressly* teach but what they would have *suggested* to one of ordinary skill in the art at the time the invention was made.") (internal quotation marks omitted; emphasis added). Appellant's arguments to the contrary are merely conclusory and unsubstantiated, and therefore have little probative value on this record. *See In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (noting that mere lawyer argument and conclusory statements that are unsupported by factual evidence are entitled to little probative value); *see also Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("Attorney argument is not evidence.").

Nor has Appellant shown any persuasive evidence on this record establishing that ordinarily skilled artisans would somehow be incapable of including the name of the peer to be located in Traversat's discovery query message, or that doing so would somehow be beyond the skill level of ordinarily skilled artisans. *See* Dec. 12–13 (noting this lack of evidence).

This is a key evidentiary deficiency, particularly given the level of ordinary skill in this art as we noted on page 14 of our earlier decision—a skill level that another panel of this Board adopted in the earlier *inter partes* review (IPR) proceeding.

Nor did we ignore the earlier panel's IPR decision as Appellant alleges. *See* Req. Reh'g 35–36. Indeed, we acknowledged it and explained its relevant findings and conclusions in arriving at our decision. *See* Dec. 3, 6–7.

As we explained, the Examiner's mapping—which we adopted in our new ground of rejection—differed markedly from that proposed by the petitioner in the earlier IPR proceeding. *See* Dec. 6–7, 11–12. As we explained on page 6 of our Decision, the petitioner in the IPR proceeding mapped the first recited instance of the remote connected services layer's service name to a *peer identifier* in Traversat, but mapped a later recited instance of that service name to a *peer name* in Traversat. We emphasized that the petitioner's reliance on both the peer identifier and peer name in Traversat was a key factor in the Board's denying institution in the IPR proceeding, for the petitioner failed to show that the peer identifier and peer name were the same and, therefore, failed to show that Traversat teaches the same service name of the remote connected services layer as claim 1 requires. Dec. 6–7. Thus, the Board in the IPR proceeding properly focused on the specific theory set forth in the IPR petition, not the mapping in this reexamination's new ground of rejection. *See also* 35 U.S.C. § 314(a) ("The Director may not authorize an inter partes review to be instituted unless the Director determines that information presented in the petition . . . shows . . . .").

Nor does Traversat teach away from the claimed invention as Appellant alleges. *See* Req. Reh'g 38–40. According to Appellant, Traversat's peer-to-peer system seeks to avoid centralization. *Id.* at 39. As such, peer identifiers are said to be required in Traversat's peer-to-peer system because, without a central authority, peer names cannot guarantee uniqueness. *Id.*

But Appellant's argument overstates Traversat's teachings. First, Traversat states that, *in one embodiment*, a peer may be assigned a *unique* string as a *name*, and *any* naming scheme can be used. Traversat col. 17, ll. 20–21. But in *another embodiment*, names are not unique unless a coordinated naming service is used to guarantee name uniqueness, where the naming service is *typically* a centralized service. *See id.* at col. 17, ll. 21–27.

Our emphasis underscores that Traversat's naming functionality on which Appellant relies pertains to different embodiments, the first of which assigns a *unique* string as a name. In that particular embodiment, the names are unique.

So even if we were to accept Appellant's premise that Traversat seeks to avoid centralization, Traversat does not say that the unique names are assigned by a centralized service in the first embodiment. Traversat col. 17, ll. 20–21. And even in the second embodiment, Traversat does not say that the naming service is *necessarily* a centralized service, but rather is *typically* a centralized service. *See id.* at col. 17, ll. 24–26.

Nevertheless, even assuming, without deciding, that a centralized service is required to assign unique strings as names—which it is not—ordinarily skilled artisans would recognize that any potential disadvantages associated with that requirement with respect to a peer-to-peer network

would be offset by the advantages of uniquely identifying the peer. In short, weighing these relative advantages and disadvantages amounts to an engineering trade-off well within the level of ordinarily skilled artisans. *See In re Mouttet*, 686 F.3d 1322, 1330 (Fed. Cir. 2012) (noting that the Board found adequate reasons to combine the cited references because, among other things, the Board found that "the relative advantages and disadvantages in selecting electrical circuitry in lieu of optical circuitry amounts to an engineering tradeoff—a decision well within the level of ordinarily skilled artisans"); *see also Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) ("[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." (internal quotation omitted)).

In short, nothing on this record indicates that Traversat criticizes, discredits, or otherwise discourages investigation into the invention claimed as required for teaching away. *See Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1326 (Fed. Cir. 2012); *see also In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away . . . if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed.") (quotation omitted).

Nor are we persuaded by Appellant's contention that our rejection purportedly failed to account for how Traversat's peer name discloses the claimed service name of the remote connected services layer of the remote endpoint. *See* Req. Reh'g 40–41. First, in our rejection, we incorporated the

Examiner's findings on pages 5 to 7 of the Final Rejection by reference. *See* Dec. 11. Those findings include specific citations to Traversat for teaching the recited (1) service name; (2) remote connected services layer; and (3) remote endpoint, as well as the recited service connection request message containing the service name of the remote connected services layer of the remote endpoint. *See* Final Act. 5–7.

Second, to the extent Appellant contends that a peer name somehow cannot constitute a service name under its broadest reasonable interpretation, there is no persuasive evidence on this record to substantiate such a contention. That Traversat's *exemplary* discovery query message in column 52, lines 45 to 55 refers to a peer, group, pipe, service, and content in connection with the request type as Appellant indicates (Req. Reh'g 41) does not change our conclusion. Not only is this message exemplary, nothing in the claim precludes equating a peer name to a service name under the term's broadest reasonable interpretation in light of the Specification.

On this record, then, we are not persuaded that our rejections of (1) claims 1–11, 18, and 19 as obvious over Traversat, and (2) claims 12–15 as obvious over Traversat and Guo, are erroneous. Therefore, we deny Appellant's request to rehear our decision in that respect.

## CONCLUSION

Appellant's Request for Rehearing is denied.

DECISION SUMMARY

Outcome of Decision on Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 1–11, 18, 19 | 103 | Traversat | 1–11, 18, 19 | |
| 12–15 | 103 | Traversat, Guo | 12–15 | |
| **Overall Outcome** | | | 1–15, 18, 19 | |

Final Outcome of Appeal after Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed | New Ground |
|---|---|---|---|---|---|
| 1–11, 18, 19 | 102(a)(2) | Traversat | | 1–11, 18, 19 | |
| 1–11, 18, 19 | 103 | Traversat | | | 1–11, 18, 19 |
| 12–15 | 103 | Traversat, Guo | | 12–15 | 12–15 |

REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

DENIED

Appeal 2024-001882
Reexamination Control No. 90/014,994
Patent US 9,357,014 B2

PATENT OWNER/APPELLANT
BURDICK PATENTS
2537 STATE STREET, STE 220
BOISE, ID 83701

THIRD PARTY REQUESTER
HAYNES AND BOONE, LLP
IP SECTION
2323 VICTORY AVENUE, SUITE 700
DALLAS, TX 75219

# EX. 1001

U.S. 9,357,014 to Shamilian et al.



**Haynes and Boone, LLP - Attorneys**
IP Section, 2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone [214] 651-5000
Fax [214] 200-0853

US009357014B2

(12) **United States Patent**
**Shamilian et al.**

(10) **Patent No.: US 9,357,014 B2**
(45) **Date of Patent: May 31, 2016**

(54) **SERVICE-BASED NETWORKING**

(71) Applicant: **Alcatel Lucent**, Paris (FR)

(72) Inventors: **John Shamilian**, Tinton Falls, NJ (US); **Sape Jurrien Mullender**, Amsterdam (NL)

(73) Assignee: **Alcatel Lucent**, Boulogne-Billancourt (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 32 days.

(21) Appl. No.: **14/264,538**

(22) Filed: **Apr. 29, 2014**

(65) **Prior Publication Data**

US 2015/0312352 A1 Oct. 29, 2015

(51) **Int. Cl.**
***H04L 29/06*** (2006.01)
***H04L 29/08*** (2006.01)

(52) **U.S. Cl.**
CPC .......... ***H04L 67/141*** (2013.01); ***H04L 63/0428*** (2013.01); ***H04L 63/08*** (2013.01); ***H04L 63/168*** (2013.01); ***H04L 67/16*** (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,161,123 A * 12/2000 Renouard .............. H04L 29/06 709/203
2002/0053032 A1 * 5/2002 Dowling et al. ............ 713/201
2005/0015427 A1 * 1/2005 Guo et al. .................... 709/200
2010/0217975 A1 * 8/2010 Grajek et al. ................ 713/157

* cited by examiner

*Primary Examiner* — David Pearson
(74) *Attorney, Agent, or Firm* — Tong, Rea, Bentley & Kim, LLC

(57) **ABSTRACT**

A service-based networking capability is presented. The service-based networking capability replaces traditional networking connections between endpoints with service connections between endpoints. The service-based networking capability supports establishment and use of a service connection between endpoints, where the service connection between endpoints may be provided below the application layer and above the transport layer. The establishment and use of a service connection between endpoints may be provided using a connected services stack, which may include a connected services layer that is configured to operate below the application layer and above the transport layer.

**19 Claims, 8 Drawing Sheets**




100
CENTRAL SERVER
120
COMMUNICATION
NETWORK
105
ENDPOINT $110_Z$
APPLICATION
$112_Z$
CONNECTED
SERVICES
STACK
$115_Z$
ENDPOINT $110_A$
APPLICATION
$112_A$
CONNECTED
SERVICES
STACK
$115_A$

FIG. 1


TCP/IP STACK
APPLICATION LAYER
TRANSPORT LAYER
INTERNET LAYER
NETWORK ACCESS LAYER
OSI STACK
APPLICATION LAYER
PRESENTATION LAYER
SESSION LAYER
TRANSPORT LAYER
NETWORK LAYER
DATA LINK LAYER
PHYSICAL LAYER
CONNECTED SERVICES STACK 115
APPLICATION LAYER (e.g., MAINTAINS USER SESSION INFO, MAINTAINS MULTIPLE CONNECTIONS TO SERVICES, ETC.)
210₁
CONNECTED SERVICES LAYER (e.g., AUTHENTICATION, ENCRYPTION, RECONNECTION, ETC.)
210₂
CONNECTED SERVICES LAYER (e.g., AUTHENTICATION, ENCRYPTION, RECONNECTION, ETC.)
TCP/UDP BEHAVIOR TRANSPORT LAYER
210₃
TCP/UDP BEHAVIOR TRANSPORT LAYER
IP NETWORK LAYER
210₄
IP NETWORK LAYER
DATA LINK LAYER
210₅
DATA LINK LAYER
PHYSICAL LAYER
210₆
PHYSICAL LAYER
SERVICE CONNECTION 1
• • •
SERVICE CONNECTION N

FIG. 2


300
CENTRAL SERVER 120
MAPPING 315
SERVICE NAME OF CSL 210₂ OF ENDPOINT 110A
SERVICE NAME OF CSL 210₂ OF ENDPOINT 110Z
SERVICE CONNECTION INFORMATION FOR SERVICE CONNECTION 340
ENDPOINT 110Z
APPLICATION 112Z
CONNECTED SERVICES STACK 115Z
SERVICE CONNECTION 340
COMMUNICATION NETWORK 105
SERVICE LOOKUP REQUEST MESSAGE 310
SERVICE LOOKUP RESPONSE MESSAGE 320
SERVICE CONNECTION ESTABLISHMENT INTERACTION 330
ENDPOINT 110A
APPLICATION 112A
CONNECTED SERVICES STACK 115A

FIG. 3


400
CENTRAL SERVER 120
MAPPING 405
IP ADDRESS CHANGE NOTIFICATION MESSAGE 420C
ENDPOINT 110Z
APPLICATION 112Z
CONNECTED SERVICES STACK 115Z
IP ADDRESS CHANGE NOTIFICATION MESSAGE 420A
COMMUNICATION NETWORK 105
IP ADDRESS CHANGE NOTIFICATION MESSAGE 410
ENDPOINT 110A
APPLICATION 112A
CONNECTED SERVICES STACK 115A

FIG. 4


500
CENTRAL SERVER 120
MAPPING 505
IP ADDRESS RESPONSE MESSAGE 520
ENDPOINT $110_Z$
APPLICATION $112_Z$
CONNECTED SERVICES STACK $115_Z$
COMMUNICATION NETWORK 105
IP ADDRESS REQUEST MESSAGE 510
ENDPOINT $110_A$
APPLICATION $112_A$
CONNECTED SERVICES STACK $115_A$

FIG. 5


600
ENDPOINT 110Z
APPLICATION 112Z
CONNECTED SERVICES STACK 115Z
CENTRAL SERVER 120
MAPPING 605
IP ADDRESS RESPONSE MESSAGE 620Z
IP ADDRESS REQUEST MESSAGE 610Z
COMMUNICATION NETWORK 105
IP ADDRESS RESPONSE MESSAGE 620A
IP ADDRESS REQUEST MESSAGE 610A
ENDPOINT 110A
APPLICATION 112A
CONNECTED SERVICES STACK 115A

FIG. 6


700
START
701
ESTABLISH SERVICE CONNECTION BETWEEN FIRST ENDPOINT AND SECOND ENDPOINT
710
SUPPORT COMMUNICATIONS BETWEEN FIRST ENDPOINT AND SECOND ENDPOINT BASED ON SERVICE CONNECTION BETWEEN FIRST ENDPOINT AND SECOND ENDPOINT
720
END
799

FIG. 7


800
COOPERATING MODULE/PROCESS 805
I/O DEVICES 806
PROCESSOR 802
MEMORY 804

FIG. 8

# SERVICE-BASED NETWORKING

## TECHNICAL FIELD

The disclosure relates generally to communication networks and, more specifically but not exclusively, to connections in communication networks.

## BACKGROUND

Networking connections are currently identified by Internet Protocol (IP) address and port number. With the advent of mobility, and now cloud-based computing, the IP address of a host of a networking connection may change. Disadvantageously, in order to maintain the networking connection and hide the change from the application, either the IP address is forced to remain the same while rerouting packets or the networking connection is closed and a new networking connection is opened. Additionally, there are various other problems and disadvantages associated with existing implementations of networking connections. Accordingly, there is a need for improvements in support for networking connections.

## SUMMARY OF EMBODIMENTS

Various deficiencies in the prior art are addressed by embodiments for service-based networking.

In at least some embodiments, an apparatus includes a processor and a memory communicatively connected to the processor, where the processor is configured to run a connected services stack. The connected services stack includes a connected services layer disposed below an application layer and above a transport layer. The connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint.

In at least some embodiments, a method includes using a processor and a memory for running a connected services stack. The connected services stack includes a connected services layer disposed below an application layer and above a transport layer, the connected services layer configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint.

In at least some embodiments, a computer-readable storage medium stores instructions which, when executed by a computer, cause the computer to perform a method including running a connected services stack. The connected services stack includes a connected services layer disposed below an application layer and above a transport layer, the connected services layer configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint.

## BRIEF DESCRIPTION OF THE DRAWINGS

The teachings herein can be readily understood by considering the detailed description in conjunction with the accompanying drawings, in which:

FIG. 1 depicts an exemplary communication system configured to support service-based networking using a connected services stack;

FIG. 2 depicts an exemplary embodiment of the connected services stack of FIG. 1;



FIG. 3 depicts an exemplary message flow for establishment of a service connection between endpoints within the context of FIG. 1;

FIG. 4 depicts an exemplary message flow for handling a soft IP address change within the context of FIG. 1;

FIG. 5 depicts an exemplary message flow for handling a hard IP address change on one side of a connection within the context of FIG. 1;

FIG. 6 depicts an exemplary message flow for handling a hard IP address change on both sides of a connection within the context of FIG. 1;

FIG. 7 depicts an exemplary method for establishment and use of a service connection between endpoints; and

FIG. 8 depicts a high-level block diagram of a computer suitable for use in performing functions presented herein.

To facilitate understanding, identical reference numerals have been used, where possible, to designate identical elements common to the figures.

## DETAILED DESCRIPTION OF EMBODIMENTS

A service-based networking capability is presented. In at least some embodiments, the service-based networking capability replaces traditional networking connections between endpoints with service connections between endpoints. In at least some embodiments, the service-based networking capability supports establishment and use of a service connection between endpoints. The service connection between endpoints may be provided above the transport layer and below the application layer. In at least some embodiments, the establishment and use of a service connection between endpoints may be provided using a connected services stack, which may include a connected services layer, disposed below an application layer and above a transport layer, that is configured to support establishment and use of the service connection. In general, use of a service connection between endpoints may provide various advantages over use of traditional transport layer connections between endpoints, such as obviating the need for applications or services to have knowledge of the underlying communication network, enabling applications or services to connect by name only, obviating the need for applications or services to be concerned with connectivity or failover (e.g., maintaining service connections, as well as the associated application layer communications running on top of service connections, through IP address changes of the endpoints), enabling restarting of an application or service after a hardware failure, enabling growing of an application or service (e.g., starting a new instance of the application or service and moving already running sessions of the application or service onto the new instance of the application or service in a manner transparent to the application or service clients of the application or service), enabling shrinking of an application or service (e.g., terminating an existing instance of the application or service and moving already running sessions of the application or service from the terminated instance of the application or service onto a different instance of the application or service in a manner transparent to the application or service clients of the application or service), enabling applications to become stateless or at least nearly stateless, handling retransmission timeouts, handling IP address changes (e.g., IP address change notifications) in a manner transparent to the application or service client of the application or service, or the like, as well as various combinations thereof.

These and various other embodiments and advantages of the service-based networking capability may be better understood by way of reference to the exemplary communication system of FIG. 1.

FIG. 1 depicts an exemplary communication system configured to support service-based networking using a connected services stack. The communication system **100** includes a communication network **105**, a first endpoint $\mathbf{110}_A$ that is communicatively connected to communication network **105** and a second endpoint $\mathbf{110}_B$ that is communicatively connected to communication network **105** (collectively, endpoints **110**), and a central server **120** that also is communicatively connected to communication network **105**.

The communication network **105** may include any communication network(s) which may support communications described within the context of FIG. 1. For example, communication network **105** may be considered to include a wireline access network(s), a wireline core network, a wireless access network, a wireless core network, a service provider access network, a service provider core network, the Internet, or the like, as well as various combinations thereof.

The endpoints **110** may be any devices which may communicate at the application layer. For example, endpoints **110** may be two end user devices (e.g., two smartphones, two computers, a smartphone and a computer, or the like), an end user device and a network-based device (e.g., a content server, a host server running a virtual machine (VM) hosting a service, or the like), two network-based devices, two devices configured for machine-to-machine (M2M) type communications, or the like), or the like, as well as various combinations thereof. As depicted in FIG. 1, the endpoints $\mathbf{110}_A$ and $\mathbf{110}_B$ include applications $\mathbf{112}_A$ and $\mathbf{112}_B$ (collectively, applications **112**). For example, the applications **112** may include any applications or services which may be supported by endpoints **110** (e.g., a messaging application or service, a voice-over-IP (VoIP) application or service, a social media application or service, a cloud computing application or service, an energy meter monitoring application or service, or the like. As further depicted in FIG. 1, the endpoints $\mathbf{110}_A$ and $\mathbf{110}_B$ are running connected services stacks (CSSs) $\mathbf{115}_A$ and $\mathbf{115}_B$ (collectively, CSSs **115**), respectively, which are configured to support communications associated with applications $\mathbf{112}_A$ and $\mathbf{112}_B$, respectively. An exemplary CSS **115** is depicted in FIG. 2.

FIG. 2 depicts an exemplary embodiment of the connected services stack of FIG. 1. As depicted in FIG. 2, CSS **115** includes a number of communication layers **210** which, for purposes of clarity, are mapped to communication layers of two commonly-used communication stacks (illustratively, the Transmission Control Protocol (TCP)/Internet Protocol (IP) Stack and the Open Systems Interconnection (OSI) Stack).

The CSS **115** includes (1) an application layer (AL) $\mathbf{210}_1$ that may be mapped to a portion of the AL of the TCP/IP Stack and that may be mapped to the AL of the OSI Stack, (2) a connected services layer (CSL) $\mathbf{210}_2$, below the AL $\mathbf{210}_1$, that may be mapped to a portion of the AL of the TCP/IP Stack and that may be mapped to the presentation layer (PL) and session layer (SL) of the OSI Stack, (3) a transport layer (TL) $\mathbf{210}_3$, below the CSL $\mathbf{210}_2$, that may be mapped to the TL of the TCP/IP Stack and that may be mapped to the TL of the OSI Stack, (4) an IP Network Layer (IPNL) $\mathbf{210}_4$, below the TL $\mathbf{210}_3$, that may be mapped to the Internet layer (IL) of the TCP/IP Stack and that may be mapped to the network layer (NL) of the OSI Stack, (4) a data link layer (DLL) $\mathbf{210}_5$, below the IPNL $\mathbf{210}_4$, that may be mapped to the network access layer (NAL) of the TCP/IP Stack and that may be mapped to the DLL of the OSI Stack, and a physical layer (PL) $\mathbf{210}_6$, below the DLL $\mathbf{210}_5$, that maps to the network access layer (NAL) of the TCP/IP Stack and that maps to the PL of the OSI Stack.

The operation of communication layers **210** of CSS **115** may be the same as the operation of corresponding communication layers of the TCP/IP Stack or OSI Stack in at least some respects and different than the operation of corresponding communication layers of the TCP/IP Stack or OSI Stack in at least some other respects, and such similarities and differences are discussed in additional detail below.

The AL $\mathbf{210}_1$ is configured to provide some functions typically provided at the application layer although, as discussed further herein, CSL $\mathbf{210}_2$ is configured such that AL $\mathbf{210}_1$ may be implemented differently than existing application layers (e.g., unlike existing application layers, AL $\mathbf{210}_1$ is not required to have knowledge of the underlying communication network, may connect to services by name only, is not required to be concerned with connectivity or failover (including local or remote IP address changes), and so forth). The AL $\mathbf{210}_1$ is configured to maintain one or more application layer connections to applications or services (e.g., applications **112** depicted and described with respect to FIG. 1). The AL $\mathbf{210}_1$ is configured to maintain user session information for application layer sessions.

The CSL $\mathbf{210}_2$ is configured to support service-based networking in which a service connection may be established between endpoints **110** and used for communication between endpoints **110**. The CSL $\mathbf{210}_2$ is configured to perform authentication functions, encryption functions, reconnection functions, timeout handling functions (e.g., retransmissions, IP address change notifications, session cancelling functions, or the like), or the like, as well as various combinations thereof. The CSL $\mathbf{210}_2$ may be configured in a manner for obviating the need for applications or services to have knowledge of the underlying communication network, enabling applications or services to connect by name only, obviating the need for applications or services to be concerned with connectivity or failover (e.g., maintaining service connections, as well as the associated application layer communications running on top of service connections, through IP address changes of either or both of the endpoints), enabling restarting of an application or service after a hardware failure, enabling growing of an application or service (e.g., starting a new instance of the application or service and moving already running sessions of the application or service onto the new instance of the application or service in a manner transparent to the application or service clients of the application or service), enabling shrinking of an application or service (e.g., terminating an existing instance of the application or service and moving already running sessions of the application or service from the terminated instance of the application or service onto a different instance of the application or service in a manner transparent to the application or service clients of the application or service), enabling applications to become stateless or at least nearly stateless, handling retransmission timeouts, handling IP address changes (e.g., IP address change notifications) in a manner transparent to the application or service client of the application or service, or the like, as well as various combinations thereof.

The TL $\mathbf{210}_3$ is configured to provide various functions typically supported at the transport layer (e.g., TCP or TCP-like behavior, UDP or UDP-like behavior, or the like, as well as various combinations thereof), although CSL $\mathbf{210}_2$ is configured such that some functions typically provided at the transport layer in existing communication stacks do not need to be supported by TL $\mathbf{210}_3$.

The IPNL $210_4$ is configured to provide various functions typically supported at the network layer or Internet layer of existing communication stacks, as will be understood by one of ordinary skill in the art. The IPNL $210_4$ also may be configured to provide IP reporting/updating functions.

The DLL $210_5$ is configured to provide various functions typically supported at the data link layer of existing communication stacks, as will be understood by one of ordinary skill in the art.

The PL $210_6$ is configured to provide various functions typically supported at the physical layer of existing communication stacks, as will be understood by one of ordinary skill in the art.

As depicted in FIG. 2, CSS 115 is configured to support one or more service connections (illustratively, service connections 1-N). Accordingly, the columns of CSS 115 that are labeled as being associated with service connections 1-N illustrate that various layers of CSS 115 may be configured to support any suitable number of service connections. The service connections may be established to support communications between respective applications on the associated endpoint on which CSS 115 is executing (illustratively, communications of application $112_A$ of endpoint $110_A$ may be supported by service connection 1, communications of a second application of endpoint $110_A$ may be supported by service connection 2, and so forth) and respective applications on one or more other endpoints (e.g., one or more applications on endpoint $110_Z$, one or more applications on one or more other endpoints, or the like, as well as various combinations thereof). The establishment and use of service connections is depicted and described in additional detail below with respect to FIGS. 3-7.

It will be appreciated that the operation of the CSS 115 is primarily depicted and described herein within the context of communication layers 210 for purposes of illustrating correlations or potential correlations between functions of CSS 115 and layers or functions of the TCP/IP and OSI Stacks. In other words, it will be appreciated that, although depicted and described herein within the context of communication layers 210, communication layers 210 may simply represent respective functions or sets of functions which may be provided CSS 115. Accordingly, in at least some embodiments, various references herein to communication layers 210 of CSS 115 may be read more generally as being functions or sets of functions of CSS 115, which may be arranged using other numbers or arrangements of communication layers, which may be implemented independent of any strictly or loosely defined communication layers, which may be provided in any suitable arrangements (e.g., supporting various types of interactions or interdependencies between various functions or sets of functions), or the like, as well as various combinations thereof.

The operation of the various communication layers 210 of CSS 115 of FIG. 2 may be better understood by considering the use of CSS 115 by the endpoints 110 of FIG. 1, as discussed in additional detail below with respect to FIGS. 3-7.

FIG. 3 depicts an exemplary message flow for establishment of a service connection between endpoints within the context of FIG. 1. More specifically, FIG. 3 depicts the exemplary communication system 100 of FIG. 1 and an exemplary message flow 300 that results in establishment of a service connection between the endpoints 110 for purposes of supporting application layer communications between the endpoints 110.

The CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ initiates a request for establishment of a service connection with the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$. The request by CSL $210_2$ of CSS $115_A$ for the establishment of the service connection with the CSL $210_2$ of CSS $115_Z$ may be initiated responsive to any suitable trigger condition (e.g., responsive to an indication that the AL $210_1$ at endpoint $110_A$ wants to communicate with the AL $210_1$ at endpoint $110_Z$, based on an expectation that the AL $210_1$ at endpoint $110_A$ may want to communicate with the AL $210_1$ at endpoint $110_Z$, and so forth).

The CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ initiates the request for establishment of a service connection with the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$ by sending a service lookup request message 310 to central server 120. The service lookup request message 310 is a request for service connection information for use by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ in establishing the service connection with the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$, and, further, for use by the CSLs $210_2$ of endpoints 110 in using the service connection eventually established between CSL $210_2$ of CSS $115_A$ and CSL $210_2$ of CSS $115_Z$. The service lookup request message 310 includes a service name of the CSL $210_2$ of CSS $115_A$ at endpoint $110_A$, and a service name of the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$. The service name of a CSL $210_2$ of a CSS 115 may be provided in any suitable format (e.g., a text-based string, a Uniform Resource Locator (URL) or a name having a URL-like format, or the like, as well as various combinations thereof).

The central server 120 receives the service lookup request message 310 from the CSL $210_2$ of CSS $115_A$ at endpoint $110_A$, obtains service connection information for the service connection (e.g., generates the service connection information, retrieves the service connection information, or the like, as well as various combinations thereof) responsive to the service lookup request message 310, stores a mapping 315 between the service names of the CSLs $210_2$ of the CSSs 115 of the endpoints 110 and the service connection information for the service connection, and sends a service lookup response message 320 to the CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ where the service lookup response message 320 includes the service connection information for the service connection. The service connection information for the service connection includes a service connection identifier of the service connection, IP addresses of the endpoints 110, and, optionally, one or more encryption keys for use by the endpoints 110 in encrypting data to be exchanged between the endpoints 110 using the service connection. The service lookup response message 320 includes the service name of the CSL $210_2$ of CSS $115_Z$ (e.g., for use by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ in establishing and using the service connection) and, as noted above, the service connection information for the service connection.

The CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ receives the service lookup response message 320 from central server 120. The CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ initiates a service connection request message, to the CSL $210_2$ of CSS $115_A$ at endpoint $110_A$, based on the information in the service lookup response message 320 received from central server 120. The service connection request message initiated by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ may include the service name of CSL $210_2$ of CSS $115_A$ at endpoint $110_A$, the service name of CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$ (received in the service lookup response message 320), the IP address of the endpoint $110_A$, the IP address of the endpoint $110_Z$ (also received in the service lookup response message 320), and the service connection identifier (also received in the service lookup response message 320). The service connection request message initiated by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ also may include one or more encryption keys

for the service connection (e.g., where such encryption keys are received in the service lookup response message 320). The service connection request message initiated by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ also may include one or more other connection parameters (e.g., required parameters for the service connection, desired parameters for the service connection, or the like, as well as various combinations thereof). The service connection request message initiated by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ also may include cryptographic information. The service connection request message initiated by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ also may include any other suitable types of information which may be included within connection requests between endpoints. The CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$ receives the service connection request message 310 initiated by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ and responds with a service connection response message (e.g., an acknowledgement message or any other suitable message) which may include some or all of the information included in the service connection request message initiated by CSL $210_2$ of CSS $115_A$ at endpoint $110_A$, additional information provided by the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$ for CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ (e.g., related to negotiation of connection parameters for the service connection), or the like, as well as various combinations thereof. The interaction between the CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ and the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$ in establishing the service connection may be a two-way connection/response interaction, a three-way handshake interaction (e.g., similar to the three-way handshake typically used for establishing TCP connections), or the like. Thus, the service connection request message and any associated responses from the CSL $210_2$ of CSS $115_Z$ at endpoint or additional exchanges between the CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ and the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$ within the context of establishing the service connection are represented in FIG. 3 by service connection establishment interaction 330.

The service connection establishment interaction 330 between CSL $210_2$ of CSS $115_A$ at endpoint $110_A$ and CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$ results in establishment of the service connection therebetween (which is indicated as service connection 340 in FIG. 3). Here, again, it is noted that the service connection 340 is a connection between CSLs $210_2$ of the endpoints 110 (rather than at the transport layers of the endpoints 110 (e.g., at the TCP layer or UDP) as in existing systems). The CSLs $210_2$ of the CSSs 115 of the endpoints 110 each maintain portions of the service connection information exchanged by the endpoints 110 during service connection establishment interaction 330. For example, the CSL $210_2$ of the CSS 115 of a given endpoint 110 may maintain the service connection identifier for the service connection 340, the service name associated with the CSL $210_2$ of the other endpoint 110, the IP address that is currently being used by the other endpoint 110, the one or more encryption keys for use in the service connection 340, connection parameters for the service connection 340, or the like, as well as various combinations thereof.

The service connection 340 provides a connection between endpoint $110_A$ and endpoint $110_Z$ that is above the transport layer (e.g., the transport layer of the TCP/IP or OSI Stacks, or the TCP/UDP functions of the TL $210_3$ of CSS 115) and below the application layer (e.g., the AL $210_1$ of CSS 115). The service connection 340 has service connection information associated therewith (e.g., the service connection identifier for the service connection 340, one or more encryption keys for use in the service connection 340, connection parameters for the service connection 340, or the like, as well as various combinations thereof). The use of service connection 340 as the connection between endpoint $110_A$ and endpoint $110_Z$ facilitates various functions which may be supported by the CSLs $210_2$ of the CSSs 115 of the endpoints 110.



The service connection 340 may be used for communication between the endpoints 110. The AL $210_1$ at endpoint $110_A$, if it has not already done so (e.g., as a trigger for establishment of the service connection 340), may request communication with the AL $210_1$ at endpoint $110_Z$. The AL $210_1$ at endpoint $110_A$ may request communication with the AL $210_1$ at endpoint $110_Z$ responsive to a request from application $112_A$ of endpoint $110_A$. The AL $210_1$ at endpoint $110_A$ may request communication with the AL $210_1$ at endpoint $110_Z$ by initiating a connection request which is passed from AL $210_1$ at endpoint $110_A$ to CSL $210_2$ of CSS $115_A$ of endpoint $110_A$. The AL $210_1$ at endpoint $110_A$ is not required to perform a name lookup in order to determine the IP address of endpoint $110_Z$, as this function has been pushed to the CSL $210_2$ of CSS $115_A$ of endpoint $110_A$. Accordingly, the connection request from the AL $210_1$ at endpoint $110_A$ may simply include an identifier (other than IP address) which may be used to identify endpoint $110_Z$ (e.g., the service name of the CSL $210_2$ of CSS $115_Z$ at endpoint $110_Z$). The CSL $210_2$ of CSS $115_A$ of endpoint $110_A$ receives the communication request from the AL $210_1$ at endpoint $110_A$, determines the IP address of endpoint $110_Z$ from local information stored by the CSL $210_2$ of CSS $115_A$ of endpoint $110_A$ for the service connection 340 between the CSL $210_2$ of CSS $115_A$ of endpoint $110_A$ and the CSL $210_2$ of CSS $115_Z$ of endpoint $110_Z$ (e.g., stored in conjunction with establishment of the service connection 340, as discussed above), and initiates communication with endpoint $110_Z$ based on the service connection 340. The communication from endpoint $110_A$ to endpoint $110_Z$ may then proceed as it normally would (e.g., via the transport layer, network layer, data link layer, physical layer). The data that is communicated from AL $210_1$ at endpoint $110_A$ to AL $210_1$ at endpoint $110_Z$ may be encrypted by the CSL $210_2$ of CSS $115_A$ of endpoint $110_A$ using the one or more encryption keys associated with the service connection 340 and, similarly, may be decrypted by the CSL $210_2$ of CSS $115_Z$ of endpoint $110_Z$ using based on the one or more encryption keys associated with the service connection 340. It will be appreciated that, although not described in detail, the process for communication from endpoint $110_Z$ to endpoint $110_A$ using service connection 340 would be similar to that described above for communication from endpoint $110_A$ to endpoint $110_Z$ using service connection 340.

The service connection 340 provides various advantages for applications of the endpoints 110, which may include obviating the need for applications or services to be concerned with connectivity (as connectivity is instead provided at the CSLs $210_2$ of the endpoints 110 for use by the higher-layer applications), obviating the need for applications or services to be concerned with failover, enabling restarting of an application or service after a hardware failure, enabling growing of an application or service (e.g., starting a new instance of the application or service and moving already running sessions of the application or service onto the new instance of the application or service in a manner transparent to the application or service clients of the application or service), enabling shrinking of an application or service (e.g., terminating an existing instance of the application or service and moving already running sessions of the application or service from the terminated instance of the application or service onto a different instance of the application or service in a manner transparent to the application or service clients of the application or service), enabling applications to become

stateless or at least nearly stateless, handling retransmission timeouts, handling IP address changes (e.g., IP address change notifications) in a manner transparent to the application or service client of the application or service, or the like, as well as various combinations thereof. The service connection **340** also provides various advantages for the endpoints **110** in general, which may include enabling changes to the IP addresses of the endpoints **110** without loss of connectivity (namely, the service connection **340** may actually be used to communicate IP address changes between the endpoints **110**, as discussed in additional detail with respect to FIG. 4), enabling the endpoints **110** to use multiple IP addresses (e.g., for multi-homing or various other purposes), or the like, as well as various combinations thereof.

Referring again to FIG. **1**, it is noted that the CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to provide various functions based on the service connection between the endpoints **110**.

In at least some embodiments, the CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to use authentication information for secure access to the central server **120**.

In at least some embodiments the CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to handle various levels of timeouts (e.g., retransmissions, soft IP address changes, hard IP address changes, session cancellation, or the like, as well as various combinations thereof). The CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to handle at least some such timeouts in a manner transparent to the applications **112** of the endpoints **110**.

In at least some embodiments, the CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to handle packet retransmissions. The CSLs $\mathbf{210}_2$ of the endpoints **110**, while the ALs $\mathbf{210}_1$ of the endpoints **110** are communicating via a service level connection (e.g., service level connection **340**), may handle retransmissions of packets based on a set of retransmission parameters (e.g., connection parameters of the service connection, application layer connection parameters exchanged by the ALs $\mathbf{210}_1$ of the endpoints **110**, or the like). The CSLs $\mathbf{210}_2$ of the endpoints **110** may use an acknowledgment protocol to guarantee that packets are sent, and may retransmit original packets at certain intervals for certain durations according to the set of retransmission parameters. The CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to handle at least some such packet retransmissions in a manner transparent to the applications **112** of the endpoints **110**.

In at least some embodiments, the CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to handle IP address changes such that, if the IP address of one or both of the endpoints **110** changes while the ALs $\mathbf{210}_1$ of the endpoints **110** are communicating via an application layer session on top of a service connection (e.g., service connection **340**), communication between the ALs $\mathbf{210}_1$ of the endpoints **110** may continue via the service connection without loss of the service connection and, thus, without requiring reestablishment of the application layer session between the ALs $\mathbf{210}_1$ of the endpoints **110**. In this manner, IP address changes may be handled in a manner transparent to the applications **112** of the endpoints **110**. The operation of endpoints **110** and central server **120** in responding to IP address changes of endpoints **110** is described in additional detail below.

In at least some embodiments, the CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to handle a soft IP address change in which the IP address of one of the endpoints **110** changes without failure of the one of the endpoints **110** (e.g., an end user device roams to a new wireless access point and is assigned a new IP address, the server on which an application is hosted changes such as when the server on which the application was originally hosted fails, or the like). An exemplary message flow **400**, for handling a soft IP address change within the context of the exemplary communication system **100** of FIG. **1**, is depicted in FIG. **4**. For purposes of clarity, this embodiment is described within the context of a change of the IP address of endpoint $\mathbf{110}_A$; however, it will be appreciated that this embodiment also may be used when the IP address of endpoint $\mathbf{110}_Z$ changes. If the IP address of endpoint $\mathbf{110}_A$ changes, endpoint $\mathbf{110}_A$ has a new IP address, but central server **120** and endpoint $\mathbf{110}_Z$ are both unaware of the new IP address of endpoint $\mathbf{110}_A$. The CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_A$ sends an IP address change notification message **410** to the central server **120**, and the central server **120** updates a mapping **405** between the service names of the CSLs $\mathbf{210}_2$ of the CSSs **115** of the endpoints **110** and the service connection information for the service connection to include the new IP address of endpoint $\mathbf{110}_A$. The CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_Z$ is then notified of the new IP address of endpoint $\mathbf{110}_A$ via an IP address change notification message **420**, which may originate from the CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_A$ (illustratively, IP address change notification message $\mathbf{420}_A$) or from central server **120** (illustratively, IP address change notification message $\mathbf{420}_C$). The IP address change notification message **420** includes the service connection identifier of the service connection and the new IP address of endpoint $\mathbf{110}_A$. The CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_Z$ receives the IP address change notification message **420** and updates the service connection information maintained by the CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_Z$ for the service connection between endpoint $\mathbf{110}_A$ and endpoint $\mathbf{110}_Z$ (e.g., associating the new IP address of endpoint $\mathbf{110}_A$ with the service connection identifier of the service connection and other service connection information maintained by the CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_Z$ for the service connection). In this manner, both endpoints **110** are able to continue to use the previously established service connection to support application layer communications between the endpoints **110** even though the IP address of endpoint $\mathbf{110}_A$ has changed (namely, the service connection identifier remains constant while the IP address of the endpoint $\mathbf{110}_A$ changes).

In at least some embodiments, the CSLs $\mathbf{210}_2$ of the endpoints **110** may be configured to handle a hard IP address change in which one of the endpoints **110** fails and is restarted. An exemplary message flow **500**, for handling a hard IP address change on one side of a connection within the context of the exemplary communication system **100** of FIG. **1**, is depicted in FIG. **5**. For purposes of clarity, this embodiment is described within the context of a failure of endpoint $\mathbf{110}_Z$; however, it will be appreciated that this embodiment also may be used when endpoint $\mathbf{110}_A$ fails. If endpoint $\mathbf{110}_Z$ fails and is restarted, endpoint $\mathbf{110}_Z$ is assigned a new IP address, and endpoint $\mathbf{110}_A$ is unaware of the new IP address of endpoint $\mathbf{110}_Z$ (and may even be unaware, at least for some amount of time, that endpoint $\mathbf{110}_Z$ has failed). For example, CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_A$ may detect that CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_Z$ has failed to acknowledge receipt of packets from endpoint $\mathbf{110}_A$ for a threshold length of time (e.g., after a retransmission timeout where CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_A$ attempts to retransmit packets to endpoint $\mathbf{110}_Z$). The central server **120** is aware of the new IP address of endpoint $\mathbf{110}_Z$ and updates a mapping **505** between the service names of the CSLs $\mathbf{210}_2$ of the CSSs **115** of the endpoints **110** and the service connection information for the service connection to include the new IP address of endpoint $\mathbf{110}_Z$. The CSL $\mathbf{210}_2$ of endpoint $\mathbf{110}_A$ sends an IP address request message **510** (including the service connection identifier of the service connection) to the central server **120**, and the central server **120** obtains the new IP address of endpoint $\mathbf{110}_Z$ from the map-

ping based on the service connection identifier and sends the new IP address of endpoint $110_Z$ to CSL $210_2$ of endpoint $110_A$ in an associated IP address response message **520**. In this manner, both endpoints **110** are able to continue to use the previously established service connection to support application layer communications between the endpoints **110** even though the IP address of endpoint $110_Z$ has changed (namely, the service connection identifier remains constant while the IP address of the endpoint $110_Z$ changes).

In at least some embodiments, the CSLs $210_2$ of the endpoints **110** may be configured to handle a hard IP address change in which both endpoints **110** fail and are restarted. An exemplary message flow **600**, for handling a hard IP address change on both sides of a service connection within the context of the exemplary communication system **100** of FIG. **1**, is depicted in FIG. **6**. If both endpoint $110_A$ and endpoint $110_Z$ fail and are restarted, both endpoint $110_A$ and endpoint $110_Z$ are assigned new IP addresses, respectively, and neither endpoint **110** is aware of the new IP address of the other endpoint **110**. The central server **120** is aware of the new IP addresses of the endpoints **110** and updates a mapping **605** between the service names of the CSLs $210_2$ of the CSSs **115** of the endpoints **110** and the service connection information for the service connection to include the new IP addresses of the endpoints **110**. The CSL $210_2$ of endpoint $110_A$ sends an IP address request message $610_A$ (including the service connection identifier of the service connection) to the central server **120**, and the central server **120** obtains the new IP address of endpoint $110_Z$ from the mapping based on the service connection identifier and sends the new IP address of endpoint $110_Z$ to CSL $210_2$ of endpoint $110_A$ in an associated IP address response message $620_A$. Similarly, the CSL $210_2$ of endpoint $110_Z$ sends an IP address request message $610_Z$ (including the service connection identifier of the service connection) to the central server **120**, and the central server **120** obtains the new IP address of endpoint $110_A$ from the mapping based on the service connection identifier and sends the new IP address of endpoint $110_A$ to CSL $210_2$ of endpoint $110_Z$ in an associated IP address response message $620_Z$. In this manner, both endpoints **110** are able to continue to use the previously established service connection to support application layer communications between the endpoints **110** even though the IP addresses of both endpoints **110** have changed (namely, the service connection identifier remains constant while the IP addresses of the endpoints **110** change). It is noted that, while the first endpoint **110** that restarts may receive stale data, this may be fixed later.

In at least some embodiments in which the new IP address of one of the endpoints **110** is communicated from the one of the endpoints **110** to the other of the endpoints **110**, the communication of the new IP address may be performed in a secure manner using the one or more encryption keys of the secure connection.

In at least some embodiments, the CSLs $210_2$ of the endpoints **110** may be configured to support collection of metadata describing the data being transmitted via the secure connection.

In at least some embodiments, the CSLs $210_2$ of the endpoints **110** may be configured to perform accounting functions for data being transmitted via the secure connection (e.g., tracking the bitrate per session, the amount of data transmitted per session, or the like, as well as various combinations thereof).

As discussed above, various embodiments of the service-based networking capability may provide various improvements to, as well as advantages over, existing communication environments. For example, and as discussed above, various embodiments of the service-based networking capability may be used to remove some or all knowledge of the network from applications and services (e.g., by instead handling such knowledge of the network in one or more operating system (OS) layers). For example, and as discussed above, various embodiments of the service-based networking capability enable applications and services to connect to services by name only. For example, and as discussed above, various embodiments of the service-based networking capability obviate the need for applications and services to be concerned with connectivity, as service-based connectivity is instead provided at the CSL of the CSS for use by the higher-layer applications and services. For example, and as discussed above, various embodiments of the service-based networking capability obviate the need for applications and services to be concerned with failover. For example, and as discussed above, various embodiments of the service-based networking capability obviate the need for applications and services to be concerned with movement or expansion/contraction of themselves or services upon which they depend. For example, and as discussed above, various embodiments of the service-based networking capability enable applications to become stateless. For example, various embodiments of the service-based networking capability enable changes to IP addresses of endpoints without loss of connectivity. For example, various embodiments of the service-based networking capability obviate the need to take corrective actions responsive to various conditions (e.g., obviating the need to force an IP address to remain the same while rerouting packets, obviating the need to close an existing networking connection and opening a new networking connection responsive to a failure, or the like). For example, various embodiments of the service-based networking capability enable endpoints to using multiple IP addresses (e.g., for multi-homing purposes or other purposes). For example, various embodiments of the service-based networking capability provide changes to existing implementations of the OS/networking library that enable various layers of the OS/networking library to work in concert without relying on the applications or services to fix or enhance the behavior of the network. For example, various embodiments of the service-based networking capability may prevent or overcome various assumptions, requirements, or disadvantages of existing implementations of networking connections, e.g., machine identifiers being fixed by hardware, machine identifiers being fixed by software such that the IP addresses becomes the machine names, dropped connections responsive to long pauses on connections (e.g., at the TCP layer), or the like, as well as various combinations thereof). For example, various embodiments of the service-based networking capability simplify the IP changes needed to support endpoint mobility, failover, expansion and contraction, and like capabilities and functions. For example, various embodiments of the service-based networking capability provide improvements in use of cloud-based infrastructure (e.g., supporting dynamic expansion and contraction of the cloud, supporting high-availability services, or the like). For example, various embodiments of the service-based networking capability may be configured to handle an active service failure (e.g., in which an active board fails) as follows: (1) the standby service becomes the active service, where the standby service may have the same name, have a different IP address, update a naming service with an indication that the previous IP address is unavailable (e.g., down, inactive, on standby, or the like), inform one or more associated connections or endpoints of the previously active service of the new IP address of the standby service (with or without providing authentication or encryption information), or the like, as well

as various combinations thereof and (2) the existing sessions may change to use of the new IP address such that existing sessions continue. For example, various embodiments of the service-based networking capability may be configured to handle multiple active service failures, such as where active services A and B fail (e.g., in which active boards A and B fail), as follows: (1) the standby service A becomes the active service, where the standby service A may have the same name, have a different IP address, update a naming service with an indication that the previous IP address is unavailable (e.g., down, inactive, on standby, or the like), inform one or more associated connections or endpoints of the previously active service A of the new IP address of the standby service A (with or without providing authentication or encryption information), refresh the IP address of active service B via the naming service based on a determination that an update to active service B fails (while potentially also updating connections to "new" active service B), or the like, as well as various combinations thereof and (2) the existing sessions may change to use of the new IP address of the standby service A such that existing sessions continue. Various other improvements to, as well as advantages over, existing communication environments may be realized via embodiments of the service-based networking capability.

FIG. 7 depicts an exemplary method for establishment and use of a service connection between endpoints. At step **701**, method **700** begins. At step **710**, a service connection is established between a first endpoint and a second endpoint. At step **720**, communications between the first endpoint and the second endpoint are supported based on the service connection between the first endpoint and the second endpoint. At step **799**, method **700** ends. It will be appreciated that various functions depicted and described with respect to FIGS. **1-6** may be provided within the context of method **700** of FIG. **7**.

FIG. **8** depicts a high-level block diagram of a computer suitable for use in performing functions described herein.

The computer **800** includes a processor **802** (e.g., a central processing unit (CPU) and/or other suitable processor(s)) and a memory **704** (e.g., random access memory (RAM), read only memory (ROM), and the like).

The computer **800** also may include a cooperating module/process **805**. The cooperating process **805** can be loaded into memory **804** and executed by the processor **802** to implement functions as discussed herein and, thus, cooperating process **805** (including associated data structures) can be stored on a computer readable storage medium, e.g., RAM memory, magnetic or optical drive or diskette, and the like.

The computer **800** also may include one or more input/output devices **806** (e.g., a user input device (such as a keyboard, a keypad, a mouse, and the like), a user output device (such as a display, a speaker, and the like), an input port, an output port, a receiver, a transmitter, one or more storage devices (e.g., a tape drive, a floppy drive, a hard disk drive, a compact disk drive, and the like), or the like, as well as various combinations thereof).

It will be appreciated that computer **800** depicted in FIG. **8** provides a general architecture and functionality suitable for implementing functional elements described herein and/or portions of functional elements described herein. For example, computer **800** provides a general architecture and functionality suitable for implementing one or more of an endpoint **110**, central server **120**, or the like.

It will be appreciated that the functions depicted and described herein may be implemented in software (e.g., via implementation of software on one or more processors, for executing on a general purpose computer (e.g., via execution by one or more processors) so as to implement a special purpose computer, and the like) and/or may be implemented in hardware (e.g., using a general purpose computer, one or more application specific integrated circuits (ASIC), and/or any other hardware equivalents).

It will be appreciated that some of the steps discussed herein as software methods may be implemented within hardware, for example, as circuitry that cooperates with the processor to perform various method steps. Portions of the functions/elements described herein may be implemented as a computer program product wherein computer instructions, when processed by a computer, adapt the operation of the computer such that the methods and/or techniques described herein are invoked or otherwise provided. Instructions for invoking the inventive methods may be stored in fixed or removable media, transmitted via a data stream in a broadcast or other signal bearing medium, and/or stored within a memory within a computing device operating according to the instructions.

It will be appreciated that the term "or" as used herein refers to a non-exclusive "or," unless otherwise indicated (e.g., use of "or else" or "or in the alternative").

It will be appreciated that, although various embodiments which incorporate the teachings presented herein have been shown and described in detail herein, those skilled in the art can readily devise many other varied embodiments that still incorporate these teachings.

What is claimed is:

**1**. An apparatus, comprising:

a processor and a memory communicatively connected to the processor, the processor configured to run a connected services stack, the connected services stack comprising a connected services layer configured to operate below an application layer and above a transport layer, wherein the connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, wherein the connected services layer is configured to support establishment of the service connection based on a service name of the connected services layer, a service name of the remote connected services layer, and a service connection identifier for the service connection, wherein the connected services layer is configured to:

send, toward a server, a service connection request message comprising the service name of the connected services layer and the service name of the remote connected services layer of the remote endpoint; and

receive, from the server, a service connection response message comprising the service name of the remote connected services layer of the remote endpoint, an Internet Protocol (IP) address of the remote endpoint, and the service connection identifier for the service connection.

**2**. The apparatus of claim **1**, wherein the service connection response message further comprises one or more encryption keys for the service connection.

**3**. The apparatus of claim **1**, wherein the connected services layer is configured to send the service connection request message responsive to:

a communication request from an application via the application layer; or

a determination that an application is expected to request communication via the application layer.

**4**. The apparatus of claim **1**, wherein the connected services layer is configured to maintain authentication information configured for use by the connected services layer in authenticating with the server.

5. The apparatus of claim 1, wherein the connected services layer is configured to:

maintain a set of service connection information for the service connection, the set of service connection information comprising the service connection identifier for the service connection, the service name of the remote connected services layer of the remote endpoint, and the IP address of the remote endpoint.

6. The apparatus of claim 1, wherein the connected services layer is configured to:

initiate establishment of the service connection with the remote connected services layer of the remote endpoint by propagating, toward the remote connected services layer of the remote endpoint, a service connection establishment request message comprising the service connection identifier for the service connection and the IP address of the remote endpoint.

7. The apparatus of claim 6, wherein the connected services layer is configured to:

participate in a handshake with the remote connected services layer of the remote endpoint for establishing the service connection with the remote connected services layer of the remote endpoint.

8. The apparatus of claim 6, wherein the connected services layer is configured to:

negotiate a set of service connection parameters with the remote connected services layer of the remote endpoint during establishment of the service connection with the remote connected services layer of the remote endpoint.

9. The apparatus of claim 1, wherein the connected services layer is configured to:

establish the service connection with the remote connected services layer of the remote endpoint based on the service connection identifier for the service connection and the IP address of the remote endpoint.

10. The apparatus of claim 9, wherein the connected services layer is configured to:

receive an application communication from an application of the apparatus via the application layer; and

propagate the application communication toward the remote endpoint using the service connection with the remote connected services layer of the remote endpoint.

11. The apparatus of claim 9, wherein the connected services layer is configured to:

receive, via the service connection, an application communication from an application of the remote endpoint; and

propagate the application communication toward an application of the apparatus via the application layer.

12. The apparatus of claim 1, wherein the connected services layer is configured to:

based on a change of the apparatus from the IP address to a new IP address:

propagate, toward the server, an IP address change notification message including the service connection identifier for the service connection and the new IP address of the apparatus.

13. The apparatus of claim 1, wherein the connected services layer is configured to:

based on a change of the apparatus from the IP address to a new IP address:

propagate, toward the remote connected services layer of the remote endpoint, an IP address change notification message including the service connection identifier for the service connection and the new IP address of the apparatus.

14. The apparatus of claim 13, wherein the apparatus is configured to detect the change of the apparatus from the IP address to the new IP address.

15. The apparatus of claim 13, wherein the connected services layer is configured to encrypt the IP address change notification message, using at least one encryption key associated with the service connection, prior to propagating the IP address change notification message.

16. The apparatus of claim 1, wherein the connected services layer is configured to:

based on a determination that the remote connected services layer of the remote endpoint has failed to acknowledge receipt of packets from the apparatus for a threshold length of time:

propagate, toward the server, an IP address request message including the service connection identifier for the service connection; and

receive, from the server, an IP address response message including a new IP address of the remote endpoint.

17. The apparatus of claim 16, wherein the connected services layer is configured to:

update a set of service connection information for the service connection, the set of service connection information comprising the service connection identifier for the service connection and the service name of the remote connected services layer of the remote endpoint, the set of service connection information being updated to replace the IP address of the remote endpoint with the new IP address of the remote endpoint.

18. A method, comprising:

running, by a processor, a connected services stack, the connected services stack comprising a connected services layer configured to operate below an application layer and above a transport layer, wherein the connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, wherein the connected services layer is configured to support establishment of the service connection based on a service name of the connected services layer, a service name of the remote connected services layer, and a service connection identifier for the service connection, wherein the connected services layer is configured to:

send, toward a server, a service connection request message comprising the service name of the connected services layer and the service name of the remote connected services layer of the remote endpoint; and

receive, from the server, a service connection response message comprising the service name of the remote connected services layer of the remote endpoint, an Internet Protocol (IP) address of the remote endpoint, and the service connection identifier for the service connection.

19. A non-transitory computer-readable storage medium storing instructions which, when executed by a computer, cause the computer to perform a method, the method comprising:

running a connected services stack, the connected services stack comprising a connected services layer configured to operate below an application layer and above a transport layer, wherein the connected services layer is configured to support establishment of a service connection between the connected services layer and a remote connected services layer of a remote endpoint, wherein the connected services layer is configured to support establishment of the service connection based on a service

name of the connected services layer, a service name of the remote connected services layer, and a service connection identifier for the service connection, wherein the connected services layer is configured to:

send, toward a server, a service connection request message comprising the service name of the connected services layer and the service name of the remote connected services layer of the remote endpoint; and

receive, from the server, a service connection response message comprising the service name of the remote connected services layer of the remote endpoint, an Internet Protocol (IP) address of the remote endpoint, and the service connection identifier for the service connection.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1153

**Short Case Caption:** In re: WSOU Investments LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 9,504 words.
- ☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- ☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 06/11/2025

Signature: /s/ Ryan Loveless

Name: Ryan Loveless